# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and STATE OF TENNESSEE,** *ex rel.* **BRANDY BRYANT and CAROL BLACKWOOD,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No.: 2:20-cv-911-ECM** |
| **COMFORT CARE HOSPICE, L.L.C.; COMFORT CARE COASTAL HOSPICE, LLC; COMFORT CARE COASTAL HOME HEALTH, LLC; COMFORT CARE HOME HEALTH OF NORTHEAST ALABAMA, LLC; COMFORT CARE HOME HEALTH OF NORTH ALABAMA, LLC; COMFORT CARE HOME HEALTH OF WEST ALABAMA, LLC; COMFORT CARE HOME HEALTH SERVICES, LLC; and COMFORT CARE HOSPICE OF MIDDLE TENNESSEE, LLC D/B/A COMFORT CARE HOSPICE OF SPRINGFIELD,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## RELATORS' FIRST AMENDED COMPLAINT

Relators BRANDY BRYANT ("Relator Bryant", "Relator", or "Bryant") and CAROL BLACKWOOD ("Relator Blackwood", "Relator", or "Blackwood") (collectively referred to as "Relators"), on behalf of themselves, the United States of America, and the State of Tennessee, allege and claim against Defendants COMFORT CARE HOSPICE, L.L.C.; COMFORT CARE COASTAL HOSPICE, LLC; COMFORT CARE COASTAL HOME HEALTH, LLC; COMFORT CARE HOME HEALTH OF NORTHEAST ALABAMA, LLC; COMFORT CARE HOME HEALTH OF NORTH ALABAMA, LLC; COMFORT CARE HOME HEALTH OF WEST

1

ALABAMA, LLC; COMFORT CARE HOME HEALTH SERVICES, LLC; and COMFORT CARE HOSPICE OF MIDDLE TENNESSEE, LLC D/B/A COMFORT CARE HOSPICE OF SPRINGFIELD (collectively "Comfort Care" and "Defendants") as follows:

## JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*  This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

2.      At all times material to this Complaint, Defendants regularly conducted substantial business within the State of Alabama and Tennessee, maintained permanent employees and offices in Alabama, and made and is making significant sales within Alabama.  Defendants are therefore subject to personal jurisdiction in Alabama.  Relators have personal knowledge and information that the Defendants commit and are committing fraud within Alabama, through witnesses, patients, and other nurses who are employed and remain employed by the Defendants.  Relators have personal knowledge that Defendants commit the alleged fraud and follow the same fraudulent schemes as set out herein within the State of Alabama and throughout Alabama as it is Defendants' corporate mentality, and Defendants' have now expanded operations into Tennessee, and it is believed the same conduct is ongoing as it is corporate mentality.

3.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants conduct business in multiple locations within this district.

## STATEMENT OF THE PARTIES

4.      Relators bring this action on behalf of the United States and the State of Tennessee against Defendants for treble damages and civil penalties arising from the Defendants' false statements and false claims in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

The Defendants are a multi-state provider of hospice services and contract with Medicare and/or Medicaid to provide such services in the States of Alabama.

5.     Relator Brandy Bryant ("Relator Bryant"), is a citizen of the United States over the age of eighteen (18) years.  Relator Bryant was employed by Defendants from February, 2018 until October, 2019, working at Comfort Care as a Registered Nurse in the coastal region of Alabama. Ms. Bryant has worked in the healthcare field for most, if not all, of her entire career.

6.     Relator Carol Blackwood ("Relator Blackwood"), is a citizen of the United States over the age of eighteen (18) years.  Relator Blackwood was employed by Defendants for almost two years starting on or about February, 2018, and ending on or about September, 2019, working at Comfort Care Hospice as a Registered Nurse in the coastal region of Alabama.  Ms. Blackwood has worked in the healthcare industry for over thirteen years with the vast majority of her career spent specifically in the hospice sector.

7.     Defendant Comfort Care Hospice, L.L.C. ("hereinafter referred to collectively as Defendant Comfort Care") is an Alabama limited liability company with its corporate headquarters at 245 Cahaba Valley Parkway, Suite 200, Pelham, Alabama 35124.  Defendant Comfort Care offers for-profit hospice services to patients throughout Alabama and Tennessee and bills the United States for potentially thousands of Medicare beneficiaries at any given time resulting in what is believed to be more than one hundred million in bills being submitted yearly. The agency office of Comfort Care is located in Pelham, Alabama.  At all times relevant to this action, Defendant Comfort Care was and is principally engaged in providing health and hospice care to individuals through Medicaid or Medicare or TriCare.

8.     Defendant, Comfort Care Coastal Hospice, LLC ("Defendant Comfort Care Coastal Hospice") is an Alabama limited liability company, an affiliate of Comfort Care Hospice,

LLC, and has its headquarters located at 245 Cahaba Valley Parkway, Suite 200, Pelham, Alabama 35124.  Defendant Comfort Care Coastal Hospice is believed to provide home health and hospice services in the State of Alabama, but not limited thereto.  At all times relevant to this action, Defendant Comfort Care Coastal Hospice was principally engaged in providing health and hospice care to individuals through Medicaid or Medicare or TriCare.

9.      Defendant, Comfort Care Coastal Home Health, LLC ("Defendant Comfort Care Coastal Home Health")  is an Alabama limited liability company, an affiliate of Comfort Care Hospice , LLC, and has its headquarters located at 245 Cahaba Valley Parkway, Suite 200, Pelham, Alabama 35124.  Defendant Comfort Care Coastal Home Health is believed to provide home health and hospice services in the State of Alabama, but not limited thereto.  At all times relevant to this action, Defendant Comfort Care Coastal Home Health was principally engaged in providing health and hospice care to individuals through Medicaid or Medicare or TriCare.

10.     Defendant, Comfort Care Home Health of Northeast Alabama, LLC ("Defendant Comfort Care Home Health of Northeast Alabama") is an Alabama limited liability company, an affiliate of Comfort Care Hospice, LLC, and has its headquarters located at 245 Cahaba Valley Parkway, Suite 200, Pelham, Alabama 35124.  Defendant Comfort Care Home Health of Northeast Alabama is believed to provide home health and hospice services in the State of Alabama, but not limited thereto.  At all times relevant to this action, Defendant Comfort Care Home Health of Northeast Alabama was principally engaged in providing health and hospice care to individuals through Medicaid or Medicare or TriCa

11.     Defendant, Comfort Care Home Health of North Alabama, LLC ("Defendant Comfort Care Home Health of North Alabama") is an Alabama limited liability company, an affiliate of Comfort Care Hospice, LLC, and has its headquarters located at 245 Cahaba Valley

Parkway, Suite 200, Pelham, Alabama 35124.  Defendant Comfort Care Home Health of North Alabama is believed to provide home health and hospice services in the State of Alabama, but not limited thereto.  At all times relevant to this action, Defendant Comfort Care Home Health of North Alabama was principally engaged in providing health and hospice care to individuals through Medicaid or Medicare or TriCare.

12.     Defendant, Comfort Care Home Health of West Alabama, LLC ("Defendant Comfort Care Home Health of West Alabama") is an Alabama limited liability company, an affiliate of Comfort Care Hospice, LLC, and has its headquarters located at 245 Cahaba Valley Parkway, Suite 200, Pelham, Alabama 35124.  Defendant Comfort Care Home Health of West Alabama is believed to provide home health and hospice services in the State of Alabama, but not limited thereto.  At all times relevant to this action, Defendant Comfort Care Home Health of West Alabama was principally engaged in providing health and hospice care to individuals through Medicaid or Medicare or TriCare.

13.     Defendant, Comfort Care Home Health Services, LLC ("Defendant Comfort Care Home Health Services") is an Alabama limited liability company, an affiliate of Comfort Care Hospice, LLC, and has its headquarters located at 245 Cahaba Valley Parkway, Suite 200, Pelham, Alabama 35124.  Defendant Comfort Care Home Health Services is believed to provide home health and hospice services in the State of Alabama, but not limited thereto.  At all times relevant to this action, Defendant Comfort Care Home Health Services was principally engaged in providing health and hospice care to individuals through Medicaid or Medicare or TriCare.

14.     Defendant, Comfort Care Hospice of Middle Tennessee, LLC d/b/a Comfort Care Hospice of Springfield ("Defendant Comfort Care Hospice of Springfield") is a Tennessee limited liability company, an affiliate of Comfort Care Hospice, LLC, and has its headquarters located at

471 Northcrest Drive, Springfield, Tennessee 37172. Defendant Comfort Care Hospice of Springfield is believed to provide home health and hospice services in the State of Tennessee, but not limited thereto. At all times relevant to this action, Defendant Comfort Care Hospice of Springfield was principally engaged in providing health and hospice care to individuals through Medicaid or Medicare or TriCare.

15.    The term "Defendants or Defendant Comfort Care" as used herein shall collectively mean Defendant Comfort Care, Defendant Comfort Care Coastal Hospice, Defendant Comfort Care Coastal Home Health, Defendant Comfort Care Home Health of Northeast Alabama, Defendant Comfort Care Home Health of North Alabama, Defendant Comfort Care Home Health of West Alabama, Defendant Comfort Care Home Health Services, Defendant Comfort Care Hospice of Springfield, unless otherwise noted. Accordingly, throughout this Complaint, Comfort Care and the many hospice agencies operated by Comfort Care will be collectively referred to as "Defendants" or "Defendant Comfort Care".

16.    The Relators are the original source of the information underlying this Complaint provided to the United States and the State of Alabama and Tennessee. The Relators have direct and independent knowledge of the information on which the allegations are based and have voluntarily provided the information to the United States as required by the False Claims Act, 31 U.S.C. § 3730(b)(2). The Relators do not believe any of the information underlying the allegations and transactions in this Complaint has been publicly disclosed.

17.    While employed with the Defendants, the Relators discovered that the Defendants conducted numerous fraudulent schemes in order to falsely obtain Medicare and Medicaid funds. The Defendants enrolled individuals who are ineligible for hospice care and without following proper authorization procedures.

18.    The Defendants violate and continue to violate federal and state False Claims Acts and other laws by systematically enrolling ineligible patients in hospice care and fraudulently submitting claims for payment to Medicare and Medicaid for providing this heightened level of health care, among other violations of federal and state laws described herein.

19.    Prior to filing this Complaint, Relators voluntarily disclosed to the United States the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3729(e)(4)(A), Relators are the original source of the information for purposes of that section. Alternatively, Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relators voluntarily provided that information to the Government before filing this Complaint. Relators are serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based, along with personal knowledge.

## THE MEDICARE HOSPICE BENEFIT

20.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

21.    Part A of the Medicare Program is a 100 percent federally funded health insurance program for qualified residents of the United States aged 65 and older, younger people with qualifying disabilities, and people with end-stage diseases.  The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes.  The benefits covered by Part A of the Medicare Program include hospice care under 42 U.S.C. § 1395x(dd).22.

22.    The United States reimburses Medicare claims from the Medicare Trust Fund through The Centers for Medicare & Medicaid Services ("CMS").  CMS, in turn, contracts with

Medicare Administrative Contractors, formerly known as "fiscal intermediaries" ("MACs"), to review, approve, and pay Medicare bills, called "claims," received from health care providers, such as the Defendants. In this capacity, MACs act on behalf of CMS.

23. Payments from Medicare, Medicaid, or other government funded programs are made directly to health care providers, such as the Defendants, rather than to the patient. This occurs when the Medicare and/or Medicaid recipient assigns his or her right to payment to the provider, such as the Defendants. The provider either submits its bill directly to Medicare and/or Medicaid for payment or contracts with an independent billing company to submit a bill to Medicare and/or Medicaid on the provider's behalf. It is believed that the Defendants handle all billing "in house" so that relative documents can be amended as needed to help conceal the fraudulent activities and increase revenue.

24. In order to be eligible for hospice care under Medicare, a patient must be eligible under Medicare Part A, diagnosed with a life-limiting illness, and have a medical prognosis of six (6) months or less to live if the disease runs its normal course. Patients are typically referred to a hospice care agency by their primary physician. Hospice care can be administered in the patient's home setting or in a qualifying health facility.

25. In order for a patient to be admitted to hospice care, the patient must be certified as being terminally ill. See 42 C.F.R. § 418.20. "Terminally ill means that the individual has a medical prognosis that his or her life expectancy is six months or less if the illness runs its normal course." See 42 C.F.R. § 418.3. Pursuant to federal and state regulations, a hospice must obtain written certification of terminal illness for each of certain periods in which a patient is admitted to hospice care. See 42 C.F.R. § 418.22(a)(1). In other words, a hospice must not only certify a patient's initial eligibility for hospice care, but also must regularly certify that patient's continued eligibility for

hospice care.  Although there are some exceptions to this, a hospice provider must obtain written certification before it submits a claim for payment under Medicare or Medicaid. See 42 C.F.R. § 418.22(a)(3).  Written certifications must be provided by a physician, whether this is the medical director of the hospice or a physician member of the hospice interdisciplinary group. 42 C.F.R. §418.22(c).  Written certifications must be made in the admitted patient's medical records. 42 C.F.R. § 418.22(d)(2).  Moreover, a hospice can admit a patient "only on the recommendation of the medical director in consultation with, or with input from, the patient's attending physician (if any)." 42 C.F.R. § 418.25(a).  In reaching a decision to certify that the patient is terminally ill, the hospice medical director must consider diagnosis of the terminal condition of the patient, other health conditions, and all current clinically relevant information supporting the patient's diagnoses. 42 C.F.R. § 418.25(b).

26.     In order to bill the Medicare Program, a hospice provider submits an electronic claim form or a hard-copy claim form called a UB-04 form.

27.     On the UB-04 form, the hospice provider must state, among other things, the identity of the patient, its provider number, the patient's principal diagnosis, the date of the patient's certification or re-certification as being terminally ill, the location where hospice services were provided, and the level of hospice care provided.  These providers also submit claims using an assigned Provider Transaction Access Number ("PTAN") as required by the Medicare Program.

28.     Hospices are paid a per diem rate based on the patient's location and level of care provided to the patient. The four levels of hospice care under Medicare regulations are Routine Home Care, Continuous Home Care, Inpatient Respite Care, and General Inpatient Care. The payment rates are based on which level of care the hospice provider furnished the patient that day. 42 C.F.R. § 418.302; Medicare Benefit Policy Manual, Chapter 9, § 40.  Hospice general inpatient

(hereinafter "GIP") care is a heightened level of hospice care wherein short-term care is provided to a patient for the purpose of pain control and symptom management that cannot be accomplished in the patient's home setting.  GIP level care typically lasts for less than two (2) weeks.  Patients may qualify for GIP care when pain or symptoms remain uncontrolled despite aggressive treatment efforts or if death is imminent.  Some examples of uncontrolled pain and symptoms include but are not limited to: pain requiring aggressive and frequent medication titration; dyspnea or respiratory distress; nausea and/or vomiting; severe agitation and/or delirium; hallucination, delusion, paranoia, agitation with combativeness; and anxiety or depression secondary to the end-stage disease process.  If patients in need of GIP level care stay in hospitals or home settings for GIP treatment, then hospice companies are reimbursed by Medicare at a lower rate than if GIP treatment is administered at a qualifying hospice care facility.

29.    All healthcare providers, including the Defendants, must comply with applicable statutes, regulations, and guidelines in order to be reimbursed by the government and the State of Alabama and Tennessee.  A provider has a duty to have knowledge of the statutes, regulations, and guidelines regarding coverage for the Medicare and Medicaid services, including all related statutes, regulations, and guidelines governing the roles and services provided by the chaplains, social workers, and other counselors.  The interdisciplinary group is responsible for coordination of each patient's care, to ensure continuous assessment of each patient's and family's needs, and the implementation of the interdisciplinary plan of care.

30.    A comprehensive assessment, which includes a bereavement assessment, must be completed within five (5) days of a patient's admission. 42 C.F.R. § 418.54. Additionally, bereavement and spiritual counseling must be provided to all admitted patients. 42 C.F.R. § 418.64.

Hospice Item Set ("HIS") certification must also be completed and completed within five (5) days of a patient's admissions which is not always timely completed by the Defendants.

31.    The written certification requires, among other things: (1) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation supporting a life expectancy of six months or less; and (3) the signature(s) of the physician(s). 42 C.F.R. § 418. This is described to providers in the Medicare Benefit Policy Manual, Chapter 9, § 20.1.

32.    An initial assessment must be completed by a hospice nurse within 48 hours of admitting a hospice patient. 42 C.F.R. § 418.54(a).

33.    A face-to-face encounter is required by a hospice physician or nurse practitioner with each individual who the hospice provider anticipates entering into the third election or re-certification period of care.  The face-to-face encounter must occur prior to, but no more than, thirty (30) calendar days prior to the third benefit period recertification, and every benefit period recertification thereafter. 42 C.F.R. § 418.22(a)(4).  This encounter is to gather clinical findings to determine continued eligibility for hospice care.

34.    Certification of a patient's terminal illness should be based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness.  The certification of terminal illness must conform to the following requirements: (1) specify that the individual's prognosis for life expectancy is six months or less if the terminal illness runs its normal course; (2) clinical information and other documentation to support that medical prognosis must accompany the certification and should be filed in the individual's medical record with the certification; (3) a brief narrative explanation of the specific clinical findings not merely checking boxes or using standard language; (4) the physician or nurse practitioner who performs the face-

to-face encounter must attest in that he or she did have the encounter with the patient; and, (5) the certification should be signed and dated by the physician and must include the benefit period dates to which the certification or recertification applies. 42 C.F.R. § 418.22(b).

35.    Under 42 C.F.R. § 418.22(c), hospice must obtain certification statements of terminal illness from the medical director or a physician at the hospice group and the individual's attending physician.  Additionally, hospice staff must maintain medical records and update those when appropriate.  Initial certifications and re-certifications of terminal illness should be filed when they are received. 42 C.F.R. § 418.22(d).

36.    Hospices must maintain a clinical record for each hospice patient that contains "correct clinical information." 42 C.F.R. § 418.104.  All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated..." 42 C.F.R. § 418.104(b).  To be covered, hospice services must be:

> [R]easonable and necessary for the palliation and management of the terminal illness as well as related conditions.  The individual must elect hospice care in accordance with § 418.24.  A plan of care must be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56.  That plan of care must be established before hospice care is provided.  The services provided must be consistent with the plan of care.  A certification that the individual is terminally ill must be completed as set forth in § 418.22.

42 C.F.R. § 418.200.

37.    The medical records created and maintained by a hospice for a patient must include "clinical information and other documentation that support the medical prognosis" of a life expectancy of six months or less if the illness runs its normal course for the patient to be eligible for the Medicare hospice benefit for the particular election period. 42 C.F.R. § 418.22. See also 170 Fed. Reg. 70532, 70534-35 (Nov. 22, 2005) (noting the same). Medicare's regulations

governing hospices also state, "the physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of six months or less as part of the certification and recertification forms." 42 C.F.R. § 418.22.

38.     Hospice employees who serve in a professional capacity must have all required licenses, certifications, and registrations and "[a]ll personnel qualifications must be kept current at all times." 42 C.F.R. § 418.114.  Federal and state regulations require hospice care companies to provide staff members such as nurses and chaplains with appropriate licensing to patients in hospice. 42 C.F.R. § 418.114.  In order to minimize costs and maximize its profits, the Defendants employed an unlicensed chaplain and nurse.

39.     Hospices must utilize volunteers to demonstrate cost savings equaling a minimum of "5 percent of the total patient care hours of all paid hospice employees and contract staff." Hospices must maintain records on the volunteer hours and work they perform. 42 C.F.R. § 418.78.

40.     Continuous care billing is only justified "during periods of crisis" where the patient "requires continuous care to achieve palliation and management of acute medical symptoms." 42 C.F.R. §§ 418.204; 418.302.

41.     Through Medicare and/or Medicaid, the United States and the State of Tennessee reimburses Hospice providers for services provided to qualified beneficiaries on a per diem rate for each day a qualified beneficiary is enrolled.  Medicare and/or Medicaid make a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided.  The daily payment rates are intended to cover costs that Hospice providers incur in furnishing services identified in patients' care plans for patients who have been determined by their physicians to be suffering from a terminal illness.

I.      **Hospice Requirements and Reimbursement Procedures**

42.     Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. See 42 C.F.R. § 418.22. Hospice is designed to provide pain relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. See 42 C.F.R. § 418.202. Qualified beneficiaries who elect Hospice agree to forego curative treatment for their terminal condition.

43.     Prior to admitting a patient or billing Medicare for hospice services, a hospice must obtain written certification of terminal illness ("COTI") for each patient for each benefit period that the patient remains under the hospice's care. See 42 C.F.R. § 418.22(a). The COTI must be signed by both: (a) the hospice medical director or physician member of the patient's interdisciplinary team; and (b) the individual patient's attending physician. 42 C.F.R. § 418.22(c). This COTI must be based on a physician's clinical judgment regarding the normal course of the individual's illness. 42 C.F.R. § 418.22(b).

44.     The COTI must conform to the following requirements: (1) The certification must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course; (2) Clinical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification; and (3) The physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and

recertification forms, or as an addendum to the certification and recertification forms. 42 C.F.R. §
418.22(b).

45.    Additionally, prior to the start of each patient's third benefit period (at which point
the patient would exceed 6 months of life from the time of their initial COTI), a hospice physician
or hospice nurse practitioner must have a face-to-face encounter with each hospice patient to gather
clinical findings to determine continued eligibility for hospice care. 42 C.F.R. 418.22(a)(4). The
face-to-face encounter (or "face-to-face visit") must occur prior to, but no more than 30 days prior
to, the third benefit period recertification and every benefit period recertification thereafter. "The
hospice face-to-face encounter is an administrative requirement related to certifying the terminal
illness. By itself, it is not billable, as it is considered administrative." Medicare Benefit Policy
Manual Chapter 9 §40.1.3.

46.    The physician's narrative of terminal illness must reflect "the patient's individual
clinical circumstances and cannot contain check boxes or standard language used for all patients."
42 C.F.R. § 418.22(b)(3)(iv).

47.    All COTIs must be signed and dated by the physician(s) and must include the
benefit period dates to which the COTI applies. 42 C.F.R. § 418.22(b)(5).

48.    Through Medicare and/or Medicaid (indirectly through the States), the United
States reimburses hospice providers for services to qualified beneficiaries on a per diem rate for
each day that a qualified beneficiary is enrolled. 42 C.F.R. § 418.302. Medicare or Medicaid makes
a daily payment, regardless of the amount of services provided on a given day and even on days
when no services are provided. Payments are made according to a fee schedule with four base
payment amounts for the four different categories of care: routine home care (RHC), continuous
home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

49.     In return for the Hospice per diem payment, hospices are obligated to provide patients with all covered palliative services. See 42 C.F.R. § 418.202. The hospice must design a plan of care (POC) inclusive of all covered services necessary to meet the patient's needs. See 42 C.F.R. § 418.56. That POC must be in place prior to the hospice's submission of a Medicare bill.

## II.     Hospice Care Planning, Coordination of Hospice Services, and Requirements for Submitting Payment.

50.     A hospice provider must designate an Interdisciplinary Group ("IDG") in consultation with the patient's attending physician and must prepare a written Plan of Care ("POC") for each patient. 42 C.F.R. §418.56. The POC must specify the hospice care and services necessary to meet the patient-specific and family-specific needs identified in the comprehensive assessment as such needs to relate to the terminal illness and related conditions. *Id*.

51.     Pursuant to 42 C.F.R. §418.56(a)(1), the IDG must include at a bare minimum:

    a.  a doctor of medicine or osteopathy (who is an employee or under contract with the hospice);

    b.  a registered nurse;

    c.  a social worker; and

    d.  a pastoral or other counselor.

52.     All hospice care and services furnished to patients and their families under the Medicare Hospice Benefit must follow an individualized written POC established by the IDG in collaboration with the attending physician, the patient or representative, and the primary caregiver, in accordance with the patient's needs. 42 C.F.R. §418.56(b). All Medicare hospice providers must ensure that each patient and the primary care giver(s) receive education and training provided by the hospice as appropriate to their responsibilities for the care and services identified in the POC. *Id.* "The hospice must develop an ***individualized*** written Plan of Care ***for each patient.***" 42 C.F.R.

§418.56(c) (emphasis added). The POC must reflect patient and family goals and interventions based on the problems identified in the initial, comprehensive, and updated comprehensive assessments. *Id.*

53.     Pursuant to 42 C.F.R. §418.56(c), a patient's individualized POC must include all services necessary for the palliation and management of the terminal illness and related conditions, including the following:

      a.   interventions to manage pain and symptoms;

      b.   a detailed statement of the scope and frequency of services necessary to meet the specific patient and family needs;

      c.   measurable outcomes anticipated from implementing and coordinating the plan of care;

      d.   drugs and treatment necessary to meet the needs of the patient;

      e.   medical supplies and appliances necessary to meet the needs of the patient; and

      f.   the interdisciplinary group's documentation of the patient's or representative's level of understanding, involvement, and agreement with the plan of care, in accordance with the hospice's own policies, in the clinical record.

54.     The hospice IDG (in collaboration with the individual's attending physician, if any) must review, revise and document the individualized POC as frequently as the patient's condition requires, *"but no less frequently than every 15 calendar days."* 42 C.F.R. §418.56(d) (emphasis added). A revised POC must include information from the patient's updated comprehensive assessment and must note the patient's progress toward outcomes and goals specified in the POC. *Id.*

55. Pursuant to 42 C.F.R. §418.56(d), the hospice must develop and maintain a system of communication and integration, in accordance with the hospice's own policies and procedures, to:

a. Ensure that the interdisciplinary group maintains responsibility for directing, coordinating, and supervising the care and services provided;

b. Ensure that the care and services are provided in accordance with the plan of care;

c. Ensure that the care and services provided are based on all assessments of the patient and family needs;

d. Provide for and ensure the ongoing sharing of information between all disciplines providing care and services in all settings, whether the care and services are provided directly or under arrangement;

e. Provide for an ongoing sharing of information with other non-hospice healthcare providers furnishing services unrelated to the terminal illness and related conditions.

56. Additionally, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.;* 42 C.F.R. § 410.50. Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

57. Finally, to enroll as a Medicare provider, the hospice provider is required to submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form 855A. In submitting Form 855A, the provider makes the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program

> instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

58.    The hospice provider will then bill Medicare by submitting a claim form (CMS Form 1450) to the Fiscal Intermediary (FI) responsible for administering Medicare hospice claims on behalf of the United States. See CMS Form 1450. Each time the hospice provider submits a claim to the United States through the FI, they must first certify that the claim was true, correct, and complete, and complied with all Medicare laws and regulations, including but not limited to those cited above.

59.    As set forth in detail below, Defendants routinely admitted and billed Medicare for hospice patients who plainly and objectively did not meet Medicare criteria for their hospice diagnosis and were not eligible or appropriate for hospice, and Defendants falsely billed the United States for these services. Additionally, Defendants knowingly made false records or statements that were material to getting these false or fraudulent claims paid by Medicare. Defendants, at different times, have failed to properly submit claims to the Government consistent with the above set out rules and regulations.

### THE SUBMISSION OF FALSE CLAIMS AND FRAUDULENT SCHEMES BY DEFENDANTS, INCLUDING SPECIFIC PATIENT EXAMPLES

60.    Upon information, personal knowledge, and experience shown through testimony, affidavits, census reports, billing detail reports, and other internal documents of the Defendants, it is known and illustrated that the Defendants have and are currently defrauding the United States, by the following schemes and actions:

    a.   systematically targeting and enrolling non-qualified persons as patients under the hospice benefit guidelines as prescribed by Medicare and Medicaid;

    b.   regularly re-certifying patients who are not terminal but instead chronic or are still receiving curative care from providers that were unaware that the patient was enrolled in a hospice program;

    c.   billing for services not provided or inadequately provided;

    d.   improperly marketing hospice care to patients in order to enroll patients not qualified for hospice care to increase census numbers and admissions;

    e.   billing Medicare and Medicaid for services not provided when nurses and other employees such as social workers, volunteers, or chaplains do not actually make the visits that are billed or do not provide the services billed unto Medicare and Medicaid; and

    f.   refusing to reimburse the government for fraudulently obtained and ill-gotten windfalls.

61.    Since at least February, 2018, the Defendants knowingly presented or caused the presentment of false claims to Medicare and/or Medicaid and created false records and statements to receive reimbursement from the government and states for hospice care.  The Relators have direct knowledge of the Defendants' fraud through their personal experience and observation of patient charts and other internal documents maintained by the Defendants related to patients enrolled by the Defendants into hospice care.

62.    Since at least February 2018, Defendants have knowingly submitted or caused the submission of claims for services not actually performed to Medicare and/or Medicaid and created false records and statements to receive reimbursement from the government and states for hospice

care.  Relators have direct knowledge of the Defendants' fraud through their personal experience,

observation of patient charts enrolled by Defendants into hospice care, and observation of other

internal documentation of the Defendants.

63.    Since at least February, 2018, Defendants have knowingly submitted or caused the

submission of claims for services not medically necessary to Medicare and/or Medicaid and

created false records and statements to receive reimbursement from the government and states for

hospice care.  Relators have direct knowledge of Defendants' fraud through their personal

experience, observation of patient charts enrolled by Defendants into hospice care, and observation

of other internal documentation of Defendants.

64.    During the time of employment of Relators, the Defendants falsely certified on

electronic claim forms that it submitted or caused to be submitted to Medicare and/or Medicaid

that its claims were "correct and complete" and that it maintained documentation on file in

compliance with the certification requirements of 42 C.F.R. § 418.22.  The Defendants created,

submitted, and/or caused to be submitted, documentation that falsely represented that certain

Medicare and/or Medicaid recipients were "terminally ill," meaning that the "individual has a

medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal

course."  Many of the Medicare patients were not eligible for the Medicare hospice benefit because

they did not have a prognosis that their life expectancy was six (6) months or less if the illness ran

its normal course and, therefore, should not have received end of life care reimbursed by Medicare

and/or Medicaid.

65.    The Defendants continued to violate other federal and state regulations in order to

cut costs and increase profits.  For example, in violation of 42 C.F.R. § 418.58, the Defendants did

not provide "a written plan of care for each individual admitted to a hospice program."  Each

patient must be provided with a written plan of care that is abided by and routinely updated. 42 C.F.R. § 418.56(b) & (c).

66.     The Defendants systematically fail to follow patient's plans of care.  By failing to treat patients as individuals with individual needs and concerns, the Defendants are able to reduce costs in nursing, home health aide, chaplain and social work services, while still receiving full daily reimbursements from Medicare and/or Medicaid for patient care.

67.     Under 42 C.F.R. § 418.20, patients being enrolled must be entitled to Medicare Part A and certified as terminally ill with a life expectancy of less than six (6) months. A medical prognosis of terminal illness must be accompanied with clinical information, documentation, and certification from a physician. See 42 C.F.R. § 418.22.  In direct violation of this requirement, multiple patients enrolled did not meet the requirements for Medicaid or Medicare, thus, the Defendants knowingly operated in violation of proper compliance.  The Defendants improperly admitted patients to the hospice program and regularly falsified required information and documentation to falsely create a prognosis of terminal illness with less than six (6) months to live for patients.

68.     Hospice providers such as the Defendants are expected to know and understand the Medicare and/or Medicaid statutes, the definition of "terminally ill," and guidance provided by the Defendants' MAC that identifies the medical criteria to assist with determining whether individuals with certain diagnoses have a prognosis of six (6) months or less.  One of the purposes of the Medicare and/or Medicaid requirements is to ensure that the limited Medicare and/or Medicaid funds are properly spent on patients who are dying and need end of life care.  The Defendants have a duty to deal honestly with the Government and states.

69.     The Defendants knew, deliberately ignored, or recklessly disregarded that the claims it submitted or caused to be submitted to Medicare falsely represented the appropriateness of patients for end of life care and the patients' eligibility for the Medicare hospice benefit.  In addition, the Defendants knew, deliberately ignored, or recklessly disregarded that its internal practices would lead to the submission of false claims to Medicare for hospice services provided to ineligible beneficiaries.

70.     The Relators have witnessed the fraudulent activities and schemes of the Defendants regarding the billing of government programs, such as Medicare, TriCare, and Medicaid, for inadequate or non-performed medical care. The Relators witnesses false claims submitted to the government, false statements and records made in furtherance of these false claims, and the Defendants willful or reckless refusal to pay back the government for fraudulently obtained funds.

   a. Patient C.K.M. was discharged on September 4, 2019 and recertified for care on September 14, 2019.  Relator Bryant recommended that this patient be discharged as inappropriate for hospice service. After an initial discharge, the directors immediately sent out a different nurse and had the patient re-certified and placed back on hospice service.  The patient only recently died as of July, 2020. This patient was assigned a nurse that never visited, but the records will reflect that the nurse visited the patient as required and as Defendants billed Medicare.  However, documents included pre-suit along with videos show the nurse that was assigned to the patient not at the patient's home yet the records indicated that the nurse was there and had been there.  This patient is seen by the Fairhope Comfort Care team at his home.

b.  Patient S.J.P. was admitted for services with Comfort Care on August 15,
2018, and was diagnosed with Alzheimer's disease.  The patient was listed for
volunteer services twice monthly with no family consent for such services on
file.  Medicare was being billed for volunteer services not rendered. No
volunteer from Comfort Care visited the patient from November 2018 through
March 2019.  This patient is seen by the Fairhope Comfort Care team at her
home.  This patient was referred by Comfort Care Coastal Home Health in
Foley. Volunteer Hetal Gajjar recorded that he made volunteer visits on the
following dates with patient S.J.P.:  November 19, 2018; November 30, 2018;
December 4, 2018; December 10, 2018; December 30, 2018; January 8, 2019;
January 31, 2019; February 5, 2019; and February 28, 2019.  Volunteer Wendy
Guerro recorded volunteer services for patient S.J.P. but never rendered the
services for March 8, 2019 and March 31, 2019.

c.  Patient H.F.G. was admitted for services with Defendant Comfort Care on May
4, 2018, and was diagnosed with Chronic Systolic (congestive) heart failure.
The patient entered respite to Eastern Shore on February 18, 2019, and received
no services from Defendant Comfort Care but services were billed and
recorded.  On February 18, 2019, the aide was called at 11:45 a.m. and informed
the Relator that they had already left Eastern Shore and was unaware that patient
H.F.G. was there needing care.  However, Kantime, the recording system for
Defendant Comfort Care, reflected that the aide did in fact visit with patient
H.F.G. and recorded vitals and that a bath was given to patient with the visit
time listed as 11:36 AM to 12:09 PM.  Chantle Uthe is a witness to the fact that

the patient H.F.G. was never visited by Defendant Comfort Care aide. On November 11, 2019 and July 10, 2019, vitals were inputted for patient H.F.G. as being performed by Registered Nurse Kevin Mann; however, Fonda Thomas reports that no vitals were ever performed on the patient by a Defendant Comfort Care employee on those dates. This patient is seen by the Fairhope Comfort Care team at her home.

d. Relators had numerous visits recorded in her name while they were on vacation out of state.

    i. Patient E.W.B.'s records reflected a visit from Relator on November 23, 2018, when the Relator was out of state on vacation.

    ii. Patient N.H. 's records reflected a visit from Relator on visit date November 22, 2018.

    iii. Patient Y.S. 's records reflected a visit from Relator on visit date November 23, 2018.

    iv. Patient S.J.P. 's records reflected a visit from Relator on visit dates November 22, 2018, and November 23, 2018. This patient's families were never contacted regarding missed visits.

e. There was a volunteer with Defendants that had healing dog and provided care and volunteer visits to patients with Comfort Care at a Robertsdale, Alabama nursing home. This volunteer had a stroke and was admitted to hospice service of the Defendants. While he was a patient on hospice service with the Defendants, his volunteer visits were still being logged as services provided.

f.  Nurse Sophia Plotinak routinely recorded visits to patients but was not making them.  Nurse Katie Castillo reported Nurse Sophia Plotinak for reporting patient visits although she was not making the visits which were being billed to Medicare for each of her patients.  Nurse Plotinak stated that she made all of her visits from home.  Same was reported several times before any employment action was taken by Defendants, and it is not believed that any corrective billing was submitted for all of Nurse Plotinak's patients.  One of these patients was Patient J.G., who was recorded and billed for services that Nurse Plotinak did not perform.

g.  On March 1, 2019, Relator Blackwood made a visit to Patient S.P.  Her daughter inquired as to her repeated requests for a volunteer to stay at her mother's home while the daughter took her father to the doctor.  Relator said that she was already signed up and had been receiving volunteer visits.  The notes in Kantime indicated that several visits were made in November and December, 2018 by a volunteer, but none since.  The daughter and the husband stated that no volunteer had ever been to the home or made a visit. Once reported by the Relator to the volunteer coordinator Victoria Sanchez, Ms. Sanchez stated that she could never get a volunteer to make a visit in Lillian which was where the patient lived.  Relator later reviewed the patient's records and saw that volunteer visits and other items were already noted in the file to be billed through January, February, and March, resulting in 3 months of fraudulent documentation.

h.  Patient E.L. was diagnosed with Alzheimer's and was not being supplied with wound care supplies as needed.  The patient's family transferred him from

Comfort Care to Community Hospice due to not being supplied with wound care supplies.   Comfort Care continued to bill Tricare/Medicare for the patient services after he was transferred to Community Hospice and billed for providing the services and supplies before the patient's family removed the patient from Defendant's hospice service. The Defendants frequently would not supply needed supplies to provide appropriate care for the hospice patients all while certifying that the appropriate service and supplies were being supplied to the patients in their bills and certifications submitted to receive payment from Medicare.

i. Patient R.V.B. was seen by Relator Blackwood on August 2, 2018, and was informed that patient had not voided in nine (9) hours and there was no foley placed during the previous skilled nurse's visit to the patient's home on same date.  All the pain patch medications for the patient were on the kitchen counter and not on the patient as required.   On the kitchen counter during Relator Blackwood's visit were the following: Fentanyl 25mcg patch, MS Contin 15 mg patch, MS Contin 30 mg patch, Ativan 0.5 mg and 1 mg.  The patient had not received any pain medication since the case manager visit that morning. The patient's family was not aware that the Fentanyl patch was to be placed on the patient for pain management.  The patient was not receiving pain medication as required nor was he on Ativan as scheduled for terminal agitation.  The patient's family was not educated on drugs in the home and had no knowledge on how or when to administer his medications.

j.   Patient V.M. was seen by Relator Blackwood on November 13, 2018, and during the visit she was asked to teach the patient's daughter, a minor child, how to give an IV push of Zofran through the patient's mediport. Relator declined to educate the minor child on such procedure. There was also no twenty-four (24) hour care being provided, or appropriate caregivers as required.

k.   Patient N.M. was seen on December 23, 2018, and it was noted that case manager Shayna Sullivan had discontinued the patient's unna boots and was applying barrier cream to venous stasis ulcers instead of the unna boots. The patient's wounds had become much worse, and the patient hadn't voided in several hours and had no bowel movement for about a week. The patient's daughter reported to Relator Blackwood that the case manager would come in on visit, do vitals and leave. This patient was being billed to Medicare.

l.   Several patients were admitted to hospice care with Defendants with no listed care giver as required.

71.   The Relators have witnessed the fraudulent activities and schemes of the Defendants regarding enrollment, re-enrollment, and lack of discharge of ineligible patients. The Relators also witnessed Defendants, and their agents submit false claims to government programs based on these ineligible patients, statements and records made in furtherance of these false claims, and the willful or reckless refusal to pay back the government for the fraudulently obtained funds. The following is a list of patients that were illegally admitted into hospice care, all of which are believed to be inappropriate for hospice care. However, the Defendants admitted, retained, and refused to discharge, these patients for a extended periods of time, yet still billed the government:

a.  Patient C.K.M. was discharged on September 4, 2019 and recertified for care on September 14, 2019.  Relator Bryant recommended that this patient be discharged as inappropriate for hospice service.  After an initial discharge, the directors immediately sent out a different nurse and had the patient re-certified and placed back on hospice service.

b.  Patient Y.S. was discharged as inappropriate for care and was assigned to RN Shana Sullivan.  Nurse Sullivan was trying to get patient Y.S. recertified for care shortly thereafter and is believed to have done so, and this patient was billed to Medicare.

c.  Patient J.G.C. was admitted for services with Comfort Care on February 14, 2015, and was diagnosed with Dementia with Lewy bodies.  This patient has received twenty-eight (28) recertification periods during his care with Defendant Comfort Care.  Recertifications were copied and pasted and not properly documented to keep the patient on the service.  This patient is believed to still be on the service or only recently passing away, with a start of care in 2015.  This patient is seen by the Fairhope Comfort Care team at his home.

d.  Patient W.B. was admitted to hospice service of Defendants on September 5, 2018, and was diagnosed with chronic obstructive pulmonary disease with acute exacerbation.  This patient was inappropriate for hospice service, but was admitted and seen by the Mobile, Alabama team of Defendants at his home.

e.  Patient F.C. was admitted to hospice service of Defendants on April 28, 2018, and was diagnosed with atherosclerotic heart disease of native coronary artery

without angina pectoris.  This patient was inappropriate by was admitted to hospice service and seen by the Mobile team of Defendants at her home.

f.  Patient G.W. was admitted to hospice service of Defendants on April 4, 2018, and was diagnosed with Parkinson's disease.  This patient was inappropriate for hospice service, but was admitted and seen by the Mobile, Alabama team of Defendants at Palm Gardens Health and Rehabilitation.

g.  Patient W.C.K. was admitted to hospice service of Defendants on November 2, 2018, and was diagnosed with hemiplegia and hemiparesis following cerebral infarction affecting left non-dominate side.  This patient was inappropriate for hospice service but was admitted to hospice by the Defendants.  This patient was referred to hospice service of Defendants by Fairhope Health and Rehabilitation and seen by the Fairhope, Alabama team of Defendants at Fairhope Health and Rehabilitation.

h.  Patient S.W. was admitted to hospice service of Defendants on May 20, 2019, and was diagnosed with malignant neoplasm of head of pancreas.  This patient was inappropriate for hospice service, but was admitted and was seen by the Fairhope, Alabama team of Defendants at his home.

i.  Patient A.R.B. was admitted to hospice service of Defendants on December 12, 2018, and was diagnosed with atherosclerotic heart disease of native coronary artery without angina pectoris.  This patient was inappropriate for hospice service but was admitted by the Defendants and billed to Medicare.  This patient was referred to Defendants' hospice service by Comfort Care Coastal Home Health and was seen by the Fairhope, Alabama team at his home.

j.  Patient B.D. was admitted to hospice service of Defendants on August 17, 2018, and was diagnosed with unspecified sequelae of cerebral infarction. This patient was inappropriate for hospice service but was admitted by the Defendants and billed to Medicare. This patient was seen by the Mobile, Alabama team at Crowne Healthcare of Mobile.

k.  Patient C.D. was admitted to hospice service of Defendants on August 16, 2018, and was diagnosed with chronic obstructive pulmonary disease with acute exacerbation. This patient was inappropriate for hospice service but was admitted by the Defendants and billed to Medicare. This patient was seen by the Mobile, Alabama team at her home.

l.  Patient J.G. was admitted to hospice service of Defendants on August 10, 2018, and was diagnosed with Parkinson's disease. This patient was inappropriate for hospice service but was admitted by the Defendants and billed to Medicare. This patient was seen by the Fairhope, Alabama team at her home.

m.  Patient P.B.H. was admitted to hospice service of Defendants on August 24, 2018, and was diagnosed with Parkinson's disease. This patient was inappropriate for hospice service but was admitted by the Defendants and billed to Medicare. This patient was referred to hospice service by Thomas Hospital and was seen by the Fairhope, Alabama team at his home.

n.  Patient D.W. was admitted to hospice service of Defendants on December 19, 2017, and was diagnosed with malignant neoplasm of upper lobe, right bronchus or lung. This patient was inappropriate for hospice service but was

admitted by the Defendants and billed to Medicare. This patient was seen by the Fairhope team at her home.

o. Patient J.G. was inappropriate but admitted and billed to Medicare anyway.

p. Patient A.B. was inappropriate, and on the hospice service and billed for a considerable period of time.

q. Patient R.A. was inappropriate for hospice care. She was admitted with cirrhosis of the liver. R.A. was active and not fit for end of life care, because she drove around and babysat the neighborhood children. The admitting nurse did not want to admit, but the director admitted her anyway. She was on the hospice service for a long period of time.

r. Patient E.A. was on the hospice service of Defendants and was inappropriate. She is believed to have over 25 re-certifications.

s. Relators witnessed the Defendant specifically enroll many ineligible individuals who suffered from Alzheimer's disease, since these patients routinely lived longer than patients with other diagnoses and diseases. The same types of fraudulent claims, false statements and records, and refusals to refund ill-gotten funds were present, if not exacerbated, with Alzheimer's patients. The following is a list of patients that were admitted with the qualifying diagnosis of Alzheimer's diseases, all of which are believed to be inappropriate for hospice care, but that were admitted and billed by the Defendants for extended periods of time:

      i. B.A. admitted July 9, 2019, seen by Mobile team at Palm Gardens Health and Rehabilitation.

ii.  H.B.B. admitted January 9, 2019, seen by the Fairhope team at home.

iii.  N.B. admitted July 22, 2019, seen by Mobile team at Palm Gardens Health and Rehabilitation.

iv.  M.B. admitted June 26, 2019, seen by Mobile team at Gulf Coast Health and Rehabilitation.

v.  P.B. admitted April 4, 2019, seen by Mobile team at home.

vi.  W.H.B. admitted September 11, 2019, seen by Fairhope team at home.

vii.  D.C. admitted June 14, 2019, seen by Mobile team at Palm Gardens Health and Rehabilitation.

viii.  L.V.D. admitted September 16, 2019, seen by Mobile team at Twin Oaks Rehabilitation and Healthcare Center.

ix.  B.E.D. admitted February 19, 2018, seen by Fairhope team at Diversicare of Foley.

x.  E.D. admitted June 26, 2019, seen by Mobile team at home.

xi.  A.L.F. admitted August 12, 2019, seen by Fairhope team at home.

xii.  B.G.F. admitted March 22, 2019, seen by Fairhope team at Diversicare of Foley.

xiii.  V.P.F. admitted May 30, 2019, seen by Fairhope team at home.

xiv.  B.G. admitted July 30, 2019, seen by Mobile team at home.

xv.  P.G. admitted March 27, 2019, seen by Mobile team at Palm Gardens Health and Rehabilitation.

xvi.  M.N.H. admitted August 15, 2018, seen by Fairhope team at Robertsdale Rehabilitation and Healthcare.

xvii.  R.L.H. admitted July 24, 2019, seen by Fairhope team at home.

xviii.  R.C.H. admitted March 7, 2019, seen by Fairhope team at home.

xix.  M.J. admitted March 23, 2019, seen by Fairhope team at home.

xx.  R.J. admitted April 3, 2019, seen by Mobile team at Twin Oaks Rehabilitation and Healthcare.

xxi.  M.L. admitted June 3, 2019, seen by Mobile team at Palm Gardens Health and Rehabilitation.

xxii.  J.L. admitted April 8, 2019, seen by Fairhope team at Diversicare of Foley. J.L. was a high-functioning individual with Alzheimer's. Relator Bryant recommended this patient for discharge. The patient was not discharged but recertified for care by Comfort Care Dr. Dowden.

xxiii.  J.M. admitted May 28, 2019, seen by Mobile team at home.

xxiv.  A.M. admitted June 25, 2019, seen by Mobile team at home.

xxv.  A.C.M. admitted April 15, 2019, seen by Mobile team at Lynnwood Nursing Home.

xxvi.  P.W.M. admitted January 30, 2019, seen by Mobile team at Allen Memorial Home.

xxvii.  S.J.P. admitted August 15, 2018, seen by Fairhope team at home.

xxviii.  F.P. admitted September 24, 2019, seen by Mobile team at home.

xxix.  Z.P. admitted August 3, 2018, seen by Mobile team at Crowne Health Care of Mobile.

xxx.  M.P. admitted October 1, 2019, seen by Mobile team at home.

xxxi.  B.R. admitted June 11, 2019, seen by Mobile team at home.

xxxii.  C.S. admitted January 4, 2018, seen by Mobile team at Crowne Health Care of Mobile.

xxxiii.  M.E.S. admitted June 11, 2019, seen by Fairhope team at Montrose Bay Health and Rehabilitation Center.

xxxiv.  R.T. admitted July 3, 2019, seen by Mobile team at home.

xxxv.  E.A.W. admitted August 28, 2019, seen by Fairhope team at home.

xxxvi.  D.W. admitted September 30, 2019, seen by Mobile team at home.

xxxvii.  F.W. admitted April 17, 2019, seen by Mobile team at Lynwood Nursing Home.

xxxviii.  E.C.G. was admitted on May 16, 2018, seen by the Mobile, Alabama team of Defendants at Crowne Health Care of Citronelle.

72.  The Relators have witnessed the fraudulent activities and schemes of the Defendants regarding their pervasive and aggressive practice of marketing hospice services to inappropriate and ineligible patients. In furtherance of this profit-driven scheme, Relators witnessed Defendants make and use false statements and false records.

a.  On July 24, 2019, Relator Blackwood was called to South Baldwin Infirmary for a possible admit of G.G.  Relator Blackwood did not have an account with Vendor Maker and was not allowed to do admits.  Marketer Ashley Boggs printed a Vendor Maker badge using her credentials but printed Relator

Blackwood's name on it in an attempt to get Relator Blackwood to admit the patient to Defendants' hospice service.

b.  Relators and other registered nurses were called on several occasions to hospitals by marketers to make admissions which is inappropriate. The marketers for Defendants at the time were Ashley Boggs, April Phillips, Heather Pearson, and Heather Howard.

c.  Alzheimer's patients, including many of the patients listed in Paragraph 56(s) were the subjects of particularly aggressive marketing of hospice services, since Alzheimer's patients routinely live longer than other patients, allowing for Defendants to perpetrate a more profitable scheme.

73.    Over the course of her first year working at Comfort Care, Relator Bryant became aware that Defendants' practices had resulted in an inordinate number of inappropriate Medicare beneficiaries for whom Defendants had billed the United States for much longer than the six months or less anticipated under the Medicare Hospice program. Relator Blackwood witnessed various services being billed that were not actually being provided unto the patients, especially in the volunteer sector, along with witnessing many inappropriate admissions and witnessed a corporate culture that was fueled by admissions and greed. The culture at the Defendants' locations places profit above medical treatment, which leads to eventual violations of law and moral wrongs. The Defendants should be held accountable for their actions in violating said laws and defrauding the Government, states, and the American people out of valuable assets for the most vulnerable citizens.

## COUNT ONE:

## PRESENTMENT OF FALSE CLAIMS FOR
## NON-RENDERED MEDICAL CARE IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

74.    Relators re-allege and incorporate the allegations in numbered 61, 62, 64, 66, 68, 69, and 70 as if fully set forth herein.

75.    The Defendants knowingly presented or caused to be presented false or fraudulent claims to the Medicare and Medicaid programs that were fraudulent because they were made for reimbursement of care never provided.

76.    The Defendants falsely claimed that patients are treated according to their plans of care and volunteer hours were provided.  By submitting claims based on non-rendered care, the Defendants submitted false and fraudulent claims for payment to the Government.

## COUNT TWO:
## FALSE STATEMENTS REGARDING NON-RENDERED MEDICAL CARE IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

77.    Relators re-allege and incorporate the allegations in numbered 61, 62, 64, 66, 68, 69, and 70 as if fully set forth herein.

78.    The Defendants knowingly made or used false or fraudulent statements, or caused false or fraudulent records and statements to be made or used, for the purpose of obtaining or aiding in obtaining the payment or approval of false Medicare and Medicaid claims by the United States.

79.    These false statements, including that proper medical care was rendered, patients' plans of care were followed, chaplain services were provided, and volunteer hours were provided, were material to the presentment of the false claims.

**COUNT THREE:**

**FAILURE TO RETURN OVERPAYMENTS FOR**
**NON-RENDERED MEDICAL CARE IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(G)**

80.     Relators re-allege and incorporate the allegations in numbered 61, 62, 64, 66, 68, 69, and 70 as if fully set forth herein.

81.     The Defendants were paid by the government for medical care which was never rendered.

82.     The Defendants knowingly and improperly avoided their legal obligation to reimburse the government for these overcharges.

**COUNT FOUR:**

**PRESENTMENT OF FALSE CLAIMS FOR**
**REGARDING INELIGIBLE PATIENTS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

83.     Relators re-allege and incorporate the allegations in numbered paragraphs 61, 63, 64, 67, 68, 69, and 71 as if fully set forth herein.

84.     The Defendants knowingly presented or caused to be presented false or fraudulent claims to the Medicare and Medicaid programs that were fraudulent because the patients were not properly eligible for hospice care.

85.     The Defendants perpetrated an aggressive practice to enroll, re-enroll, and refuse to un-enroll patients from hospice care, with a particular focus on Alzheimer's patients.

86.     By submitting claims based on ineligible hospice patients, the Defendants submitted false and fraudulent claims for payment to the Government.

**COUNT FIVE:**
**FALSE STATEMENTS TO THE GOVERNMENT REGARDING INELIGIBLE**
**PATIENTS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)**

87.    Relators re-allege and incorporate the allegations in numbered paragraphs 61, 63, 64, 67, 68, 69, and 71 as if fully set forth herein.

88.    The Defendants knowingly made or used false or fraudulent statements and records or caused false or fraudulent records and statements to be made or used, to the Government when they stated that ineligible patients were indeed illegible for government-financed hospice care.

89.    These false statements and records, namely that the ineligible Alzheimer's patients were appropriate for hospice care, were substantially related and material to the presentment of the false claims of ineligible patients

**COUNT SIX:**
**FAILURE TO RETURN OVERPAYMENTS FOR**
**INELIGIBLE PATIENTS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(G)**

90.    Relators re-allege and incorporate the allegations in numbered paragraphs 61, 63, 64, 67, 68, 69, and 71 as if fully set forth herein.

91.    The Defendants received money from the government for inappropriate and ineligible hospice care patients, namely Alzheimer's patients.

92.    The Defendants knowingly and improperly avoided their legal obligation to reimburse the government for these overcharges.

**COUNT SEVEN:**
**FRAUDULENT MARKETING PRACTICES IN VIOLATION OF**
**U.S.C. § 3729(a)(1)(B)**

93.    Relators re-allege and incorporate the allegations in numbered paragraphs 61, 64, 68, 69, and 72 as if fully set forth herein.

94.     Via their aggressive marketing practices, the Defendants knowingly made or used false or fraudulent statements and records or caused false or fraudulent records and statements to be made or used, to induce the enrollment of ineligible patients.

95.     Since the purpose of the false statements and records were specifically to ineligible patients to induce them into to hospice care, the Defendants are liable for this distinct fraudulent scheme from the false statements made directly to the government regarding the patients' eligibility alleged in Count Five.

96.     The use of these false statements and records are substantially related and material to the false claims submitted by Defendants, since the patients were fraudulently enrolled after these aggressive marketing practices.

## PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT

WHEREFORE, PREMISES CONSIDERED, the Relators respectfully request that this Court enter judgment against the Defendants, as follows:

(a)     That the United States be awarded damages in the amount of three (3) times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 et seq. provides;

(b)     That civil penalties be imposed at the maximum amount allowable under the law for each and every false claim that the Defendants presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the unlawful acts for which redress is sought in this Complaint;

(e)     That the Relators be awarded the maximum percentage of any recovery allowed pursuant the False Claims Act, 31 U.S.C. § 3730(d)(1), (2), and

(f)     That this Court award such other and further relief as it deems proper.

**<ins>COUNT EIGHT</ins>**
**VIOLATING THE TENNESSEE FALSE CLAIMS ACT**
**(Presenting False or Fraudulent Claims)**

97.     This is a claim under the Tennessee False Claims Act, Tennessee Code §§ 71-5-181 through 71-5-185, as amended.

98.     By and through the fraudulent schemes described herein, the Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented false or fraudulent claims for payment by TennCare, or knowingly caused false or fraudulent claims for payment or approval to be presented, to TennCare in violation of Tennessee Code § 71-5-182(a)(1)(A).

99.     In reliance upon the Defendants' false statements, records, and actions set out herein and above, the State of Tennessee paid false claims that it would not have paid if not for those false statements, records, and actions.

100.     By virtue of the false claims presented or caused to be presented by Defendants, the State of Tennessee has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,000 and not more than $25,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

**COUNT NINE**
**VIOLATING THE TENNESSEE FALSE CLAIMS ACT**
**(Using False Statements or Records)**

101.    This is a claim under the Tennessee False Claims Act, Tennessee Code §§ 71-5-181 through 71-5-185d, as amended.

102.    By and through the fraudulent schemes described herein and above, Defendants knowingly — by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information — made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by Tenncare, in violation of Tennessee Code § 71-5-182(a)(1)(B), to-wit:

    a.  The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Defendants to TennCare, among other things described above.

103.    In reliance upon Defendants' false statements and records, TennCare paid false claims that it would not have paid if not for those false statements and records.

104.    By virtue of the false statements and records used by the Defendants, the State of Tennessee has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,000 and not more than $25,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

**COUNT TEN**
**CONSPIRING TO VIOLATE THE TENNESSEE FALSE CLAIMS ACT**
**(Presenting False or Fraudulent Claims)**

105.    This is a claim under the Tennessee False Claims Act, Tennessee Code §§ 71-5-181 through 71-5-185d, as amended.

106.    The Defendants conspired to:

a.    Knowingly present or caused to be presented false or fraudulent claims for payment or approval under the Medicaid program; and

b.    Knowingly make, use, or cause to be made or use false records or statements material to a false or fraudulent claims.

107.    The Defendants knowingly presented, or caused to be presented, false or fraudulent claims to TennCare for payment or approval, to-wit: Defendants knowingly fraudulently certified and/or re-certified hospice patients and failed to devise valid plans of care, and presented or caused to be presented false claims to the State of Tennessee through TennCare for payment of same.

108.    TennCare paid Defendants for such false claims.

109.    Defendants, in concert with their principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the State of Tennessee.

110.    Defendants and their principals, agents, and employees acted, by and through the conduct described supra, with the intent to defraud the State of Tennessee by submitting false claims for payment to the State of Tennessee through TennCare.

111.    Defendants' fraudulent actions, together with the fraudulent actions of their principals, agents and employees, have resulted in damage to the State of Tennessee equal to the amount paid by the State of Tennessee to Defendants and others as a result of Defendants' fraudulent claims.

## **PRAYER FOR RELIEF UNDER THE TENNESSEE FALSE CLAIMS ACT**

WHEREFORE, PREMISES CONSIDERED, the Relators respectfully request that this Court enter judgment against the Defendants, as follows:

(a)     That the State of Tennessee be awarded damages in the amount of three (3) times the actual damages sustained by the State of Tennessee (or TennCare) because of the  (including investigative costs) law for each false claim or record as provided by the Tennessee False Claims Act.

(b)     That civil penalties of not less than five thousand dollars ($5,000) and not more than twenty-five thousand dollars ($25,000), adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, compiled in 28 U.S.C. § 2461 note; Public Law 101-410, be imposed for each and every false or fraudulent claim that the Defendants presented to the State of Tennessee;

(c)     That the Relators be awarded the maximum percentage of all civil penalties and damages obtained from Defendants on behalf of the State of Tennessee (or TennCare);

(d)     That pursuant to Tennessee Code § 71-5-183, the Relators be awarded all reasonable attorneys' fees, costs, and expenses necessarily incurred in bringing and pressing this case; and

(e)     That this Court award such other and further relief as it deems proper.


## DEMAND FOR JURY TRIAL

The Relators, on behalf of themselves, the United States, and the State of Tennessee demand a jury trial on all claims alleged herein.

Respectfully submitted this the 22nd day of May, 2025.


                              CAROL BLACKWOOD AND BRANDY
                              BRYANT, *ex rel.* UNITED STATES OF
                              AMERICA, and STATE OF TENNESSEE,
                              RELATORS


                    By: *T. Jason Hadley*
                              T. JASON HADLEY (ASB-4282H71H)
                              Attorney for the Relators
                              THE HADLEY LAW FIRM, LLC
                              Post Office Box 1347
                              Bay Minette, Alabama 36507
                              Tel: (251) 937-7777
                              Fax: (251) 937-7711
                              jason@thehadleylawfirm.com



                    **RELATORS DEMAND A TRIAL BY STRUCK JURY**