IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | ) | |
| STATE OF TENNESSEE, | ) | |
| *ex rel.* BRANDY BRYANT and | ) | |
| CAROL BLACKWOOD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 2:20-cv-911-ECM |
| | ) | [WO] |
| COMFORT CARE HOSPICE, | ) | |
| L.L.C., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

This lawsuit involves ten claims arising under the False Claims Act, 31 U.S.C. § 3729 (the "FCA"), and the Tennessee Medicaid False Claims Act, TENN. CODE §§ 71-5-181 to -185 (the "TMFCA"). Defendants move to dismiss Plaintiffs' amended complaint. (Doc. 84). Plaintiffs oppose (doc. 87) and move to strike (doc. 86) the motion. The United States of America has intervened for the limited purpose of responding to Defendants' argument that the qui tam provisions of the FCA are unconstitutional. (Doc. 91). Upon consideration, and for good cause, Plaintiffs' motion to strike is due to be DENIED and Defendants' motion to dismiss is due to be GRANTED in part and DENIED in part.

## I. BACKGROUND

Plaintiffs, Brandy Bryant and Carol Blackwood, are registered nurses who previously worked for Defendants. (*See* doc. 82 at 3, paras. 5–6). Defendants are eight related limited liability companies: (1) Comfort Care Hospice, L.L.C., (2) Comfort Care

Coastal Hospice, LLC, (3) Comfort Care Coastal Home Health, LLC, (4) Comfort Care Home Health of Northeast Alabama, LLC, (5) Comfort Care Home Health of North Alabama, LLC, (6) Comfort Care Home Health of West Alabama, LLC, (7) Comfort Care Home Health Services, LLC, and (8) Comfort Care Hospice of Middle Tennessee, LLC d/b/a Comfort Care Hospice of Springfield (collectively "Defendants" or "Comfort Care"). (*Id.* at 3–6, paras. 7–14).

The Court begins by summarizing the Medicare hospice benefit.  Next, the Court describes Plaintiffs' allegations and the allegations made in another lawsuit involving Comfort Care: *United States ex rel. Bonnie Brooks v. Comfort Care Hospice, LLC*, No. 2:20-cv-00508-BL-CWB (July 21, 2020) [hereinafter *Brooks*].[1]  The Court concludes this section with a brief sketch of the procedural history relevant to Defendants' motion.

## A.    The Medicare Hospice Benefit

"Medicare is a federal health insurance program designed to provide medical services, medical equipment, and supplies to persons [sixty-five] years of age and older and to blind and disabled persons." *United States v. Whiteside*, 285 F.3d 1345, 1346 (11th Cir. 2002); *see* 42 U.S.C. §§ 1395–1395mmm.  Medicare provides two types of care: (1) curative care, which includes treatment intended to relieve the patient of an illness or ailment; and (2) hospice care, which is "an approach to treatment that recognizes the impending death of an individual warrants a change in the focus from curative to palliative

---

[1] The *Brooks* allegations are relevant to Defendants' argument that Plaintiffs' claims are barred under the first-to-file rule. *See infra* § IV.D.  Accordingly, the Court takes judicial notice of the *Brooks* complaint. *See* FED. R. EVID. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it[] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

care for relief of pain and for symptom management." Hospice Quality Reporting Requirements and Process, 79 Fed. Reg. 50452, 50454 (Aug. 22, 2024).

"In order for a hospice claim to be eligible for Medicare reimbursement, the patient's attending physician . . . and the medical director of the hospice provider must 'each certify in writing . . . that the individual is terminally ill . . . based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness.'" *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1282 (11th Cir. 2019) (quoting 42 U.S.C. § 1395f(7)(A)). A patient is considered "terminally ill" if his "life expectancy is [six] months or less." 42 U.S.C. § 1395x(dd)(3)(A). An attending physician must certify that a patient is terminally ill within the first ninety days of hospice care, and recertifications are required every sixty or ninety days thereafter. 42 U.S.C. § 1395f(7)(A).

To ensure compliance with eligibility requirements, certifications must comply with various rules. For example, they must include "[c]linical information and other documentation that support the medical prognosis." 42 C.F.R. § 418.22(b)(2). And "[t]he physician must include a brief narrative explanation of the clinical findings that support[] a life expectancy of [six] months or less," which "must reflect the patient's individual clinical circumstances and cannot contain check boxes or standard language used for all patients." 42 C.F.R. § 418.22(b)(3). Medicare hospice benefit program participants must also "designate an interdisciplinary group"—comprised of a physician; a nurse; a "social worker, marriage and family therapist, or a mental health counselor"; and a "pastoral or other counselor"—that must consult with the patient's attending physician to prepare a written plan of care for each patient. 42 C.F.R. § 418.56(a)–(b). That plan of care must be

individually tailored to "reflect patient and family goals," and "must include all services necessary for the palliation and management of the terminal illness." 42 C.F.R. § 418.56(c).

## B.    Plaintiffs' Allegations

Plaintiffs identify many patients they allege were either improperly enrolled in hospice care, improperly recertified, or not properly discharged once determined to be ineligible—or all three. (*See* doc. 82 at 23–35, paras. 70–71; *accord* doc. 1 at 26–38, paras. 70–71). For example, Plaintiffs allege that one patient, "J.G.C.," has been recertified twenty-eight times with "copied and pasted" recertification documents. (Doc. 82 at 29, para. 71(c); *see also id.* at 32, para. 71(r) ("Patient E.A. was on the hospice service of Defendants and was inappropriate. She is believed to have over [twenty-five] recertifications.")). They also identify thirty-eight Alzheimer's patients who were improperly admitted to hospice care—because, Plaintiffs claim, such patients "routinely lived longer than patients with other diagnoses and diseases," and thus could generate more profit for Defendants. (*Id.* at 32–35, paras. 71(s)(i)–(xxxviii); *accord* doc. 1 at 36–38, paras. 71(a)–(kk)). Plaintiffs similarly claim that Defendants routinely failed to develop a plan of care for each patient admitted into hospice services. (Doc. 82 at 21, para. 65; *accord* doc. 1 at 24, para. 64). To the extent plans of care were developed, Plaintiffs assert that they were not followed. (Doc. 82 at 22, para. 66; *accord* doc. 1 at 24, para. 65). Plaintiffs also argue that Defendants maintain an "aggressive practice of marketing hospice services" to ineligible patients, especially those with Alzheimer's. (Doc. 82 at 35–36, para. 72; *accord* doc. 1 at 36, para. 71).

Plaintiffs identify a number of specific patients for whom Defendants purportedly submitted claims for services that were either not rendered at all or inadequately rendered. (Doc. 82 at 23–28, paras. 70(a)–(*l*); *accord* doc. 1 at 26–36, paras. 70(a)–(kk)).   For example, Plaintiffs claim records indicate they visited patients on November 22 and 23, 2018, "while they were on vacation out of the state." (Doc. 82 at 25, para. 70(d); *accord* doc. 1 at 29, para. 70(i)).   Plaintiffs likewise allege that one of Defendants' volunteers[2] "had a stroke and was admitted to hospice service," but that Defendants nevertheless continued to record and log services provided by that volunteer "[w]hile he was a patient on hospice service." (Doc. 82 at 25, para. 70(e); *accord* doc. 1 at 31, para. 70(n)).

## C.    Bonnie Brooks' Allegations

On July 21, 2020, three months before Plaintiffs initiated the instant lawsuit (*see* doc. 1), Bonnie Brooks filed a separate qui tam complaint against several defendants, including Comfort Care Hospice, L.L.C., (*see* doc. 1 in *Brooks*).   Her complaint alleges a fundamentally similar fraudulent scheme:  "Defendant Comfort Care [Hospice, L.L.C.] has defrauded the United States by submitting, or causing to be submitted, false or fraudulent claims to Medicare for hospice patients who were not terminally ill and were thus ineligible for the Medicare Hospice Benefit." (Doc. 1 at 17, para. 38 in *Brooks*).   Brooks submits that Comfort Care Hospice, L.L.C. "also failed to provide legitimate hospice services pursuant to legitimate individualized [p]lans of [c]are." (Doc. 1 at 17, para. 39 in *Brooks*).

---

[2] Hospice providers are required to use volunteers to lower costs and "must document the cost savings achieved through the use of volunteers." 42 C.F.R. § 418.78(d), (e).

She alleges that Comfort Care Hospice, L.L.C. was aided by one Dr. John Wagner, who was "the largest referral source of hospice patients to Comfort Care's Cullman, Alabama Agency." (Doc. 1 at 4, para. 5 in *Brooks*).  Dr. Wagner is also Comfort Care Cullman's attending physician and medical director for all on-site hospice patients— meaning that he "is the sole physician responsible for certifying these patients' hospice eligibility." (Doc. 1 at 22, para. 49 in *Brooks*); *see* 42 C.F.R. § 418.22(c).  But according to Brooks, Dr. Wagner does not meaningfully participate in the certification and recertification processes; "[i]nstead, Comfort Care['s] non-physician staff is made to attempt to perform all required medical director duties, including drafting the certification of terminal illness narrative statements and falsifying Dr. Wagner's signature on certifications of terminal illness." (Doc. 1 at 22–23, para. 50 in *Brooks*).  According to Brooks, Comfort Care Hospice, L.L.C. also employed "aggressive methods" to enroll ineligible patients, encouraging employees "to solicit referrals not only from healthcare facilities . . . but also 'from the community' such as from employees' churches." (Doc. 1 at 18–19, paras. 42–43 in *Brooks*).

## D.    Procedural History

Plaintiffs filed suit on November 9, 2020, when they filed their first ("original") complaint. (Doc. 1).  The case remained under seal for nearly four years while the United States investigated Plaintiffs' claims and deliberated as to whether to intervene. (*See* docs. 4, 7, 10, 14, 17, 21, 26, 30).  The United States ultimately declined to intervene (doc. 34), and the complaint was unsealed (doc. 35).  Defendants were served (doc. 38), appeared (*see* docs. 40, 42–48), and moved to dismiss the original complaint (doc. 62).  Plaintiffs

responded by seeking leave to amend. (Doc. 78).  The Court granted that motion (doc. 81), and Plaintiffs filed the amended ("operative") complaint (doc. 82).

The operative complaint includes ten claims that fall into four buckets.  First, Plaintiffs allege Defendants violated the FCA by submitting claims for reimbursement for non-rendered medical care (Counts One, Two, and Three). (*Id.* at 37–38, paras. 74–82). Second, they claim Defendants violated the FCA by submitting claims for reimbursement for hospice care rendered to ineligible patients (Counts Four, Five, and Six). (*Id.* at 38–39, paras. 83–92).   Third, they contend Defendants made false statements through "their aggressive marketing practices" that separately violated the FCA (Count Seven). (*Id.* at 39–40, paras. 93–96).  Fourth, Plaintiffs allege three violations of the TMFCA (Counts Eight, Nine, and Ten). (*Id.* at 41–43, paras. 97–111).

Defendants move to dismiss the operative complaint in its entirety. (Doc. 84). Plaintiffs responded in opposition (doc. 87) and separately move to strike the motion to dismiss under Federal Rule of Civil Procedure 12(g)(2) (doc. 86).  The United States has intervened for the limited purpose of responding to Defendants' argument that the FCA's qui tam provisions are unconstitutional. (Doc. 91).

## II. JURISDICTION AND VENUE

The Court has original subject matter jurisdiction over Plaintiffs' FCA claims under 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction over Plaintiffs' TMFCA claims under 28 U.S.C. § 1367.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

# III. LEGAL STANDARDS

## A. Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim, a court "accept[s] the allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiff." *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[D]etailed factual allegations" are generally not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## B. Rule 9(b)

A claim sounding in fraud—such as an FCA claim—"must state with particularity the circumstances constituting [the] fraud." FED. R. CIV. P. 9(b); *see United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1308 (11th Cir. 2002). To meet this particularity requirement, the claim must set forth "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the [p]laintiff[]; and (4) what the defendants gained from the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997). In other words, the claim must provide

"the who, what, when[,] where, and how" of the alleged fraudulent activities. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (quotation omitted).

Rule 9(b) serves two purposes: (1) it ensures that defendants know "exactly what misconduct they've been charged with" and (2) "protect[s] them against frivolous lawsuits." *Olhausen v. Arriva Med., LLC*, 124 F.4th 851, 861 n.11 (11th Cir. 2024). "This second purpose is especially important in FCA cases filed by relators"[3] because it operates to ensure "that the relator's strong financial incentive to bring an FCA claim does not precipitate the filing of frivolous suits." *Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297, 1317 (11th Cir. 2024) (alterations adopted and quotation omitted). All the same, courts must "harmonize the directives of Rule 9(b) with the broader policy of notice pleading" and so should not dismiss a complaint "if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that [the] plaintiff has substantial pre[-]discovery evidence of those facts." *Id.* at 1318 (alteration adopted and quotations omitted).

## C.    Shotgun Pleading

A shotgun pleading is a complaint that fails to conform to the Federal Rules of Civil Procedure's pleading requirements. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). The "unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323. "[A]

---

[3] Private individuals who assert claims under the FCA's qui tam provisions are called "relators." *See, e.g.*, *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1284 (11th Cir. 2019).

district court that receives a shotgun pleading should strike it and instruct counsel to replead the case." *Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020).

**D.    First-to-File Bar**

"When a person brings an action under [the FCA], no person other than the Government may . . . bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).  Application of this section—the first-to-file bar—has a timing element and a substantive element.  The latter asks whether the substance of two discrete FCA actions are "related" "based on the facts underlying the pending action."  The former asks whether, *at the time* the second FCA action is brought, the first, related FCA action is "pending."

The first-to-file bar's focus is on the facts alleged, not the claims brought. *See* 31 U.S.C. § 3730(b)(5) (barring subsequent actions "based on the *facts* underlying the pending action" (emphasis added)).  Accordingly, "two actions are related if they incorporate the same material elements of fraud." *Cho ex rel. States v. Surgery Partners, Inc.*, 30 F.4th 1035, 1042 (11th Cir. 2022) (quotation omitted).  "[T]he cases must rely on the same essential facts." *Id.* (quotation omitted).  To determine whether a later-filed action is sufficiently related to a pending action, courts "compare[] the two complaints side-by-side and ask[] whether the later complaint alleges a fraudulent scheme the government already would be equipped to investigate based on the first complaint." *Id.* (quotation omitted).  A later-filed claim will be barred so long as it is "related" to an earlier-filed claim, "even if the allegations incorporate somewhat different details"—the claims need not be "identical." *Id.* (quoting *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 116 (D.C.

10

Cir. 2015)); *see United States ex rel. Bernier v. Infilaw Corp.*, 347 F. Supp. 3d 1075, 1083 (M.D. Fla. 2018) ("Assessing relatedness is not rocket science; doing so requires 'comparing the complaints side-by-side' to see whether 'the claims in the second action incorporate "the same material elements of fraud" as the earlier action, even if the allegations incorporate additional or somewhat different facts or information.'" (alteration adopted) (quoting *Heath*, 791 F.3d at 121)).[4]

## IV.  DISCUSSION

First, the Court briefly addresses Defendants' argument that the FCA's qui tam provisions are unconstitutional.  Next, the Court explains why Plaintiffs' motion to strike is due to be denied and why their argument that Rule 12(g)(2) bars Defendants' motion to dismiss is similarly unavailing.  Over the next three sections, the Court concludes that each of Plaintiffs' ten claims are due to be dismissed without prejudice.

### A.    Constitutionality of the Qui Tam Provision

Defendants submit that the FCA's qui tam provisions violate the United States Constitution. (Doc. 84 at 34–40).  They submit that Plaintiffs, by virtue of the authority granted them by the qui tam provisions, act as officers of the United States who have not been constitutionally appointed. (Doc. 84 at 34–37); *see* U.S. CONST. art. II, § 2 ("[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law[] . . . .").  They further claim

---

[4] Here and elsewhere the Court cites nonprecedential authority.  The Court acknowledges these cases are nonbinding but nevertheless finds them persuasive.

that Plaintiffs' ability to bring lawsuits on behalf of the United States absent "meaningful mechanisms for supervision or removal" by the President runs afoul of the Vesting and Take Care Clauses. (Doc. 84 at 37–40); *see* U.S. CONST. art. II, § 1 ("The executive Power shall be vested in a President of the United States of America."); *id.* § 3 ("[The President] shall take Care that the Laws be faithfully executed[] . . . .").

This argument largely tracks the analysis of a district judge in the Middle District of Florida. *See United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293, 1322 (M.D. Fla. 2024) (reasoning that the appointment of relators under the FCA's qui tam provisions violates the Appointments Clause).  That case is currently on appeal to the Eleventh Circuit, which recently held oral argument. *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, No. 24-13581 (11th Cir. Dec. 12, 2025).  But, at present, there is no binding authority that supports Defendants' argument; rather, "the current consensus among federal courts is that *qui tam* lawsuits are constitutional." *Deligdish v. N. Brevard Cnty. Hosp. Dist.*, 2025 WL 2217710, at *12 (M.D. Fla. Aug. 5, 2025) (quotation omitted); *see Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019) ("A relator is neither appointed as an officer of the United States nor employed by the United States." (internal citation omitted)).[5]  Absent controlling authority, the Court will not disregard "decades—nay, centuries—of litigation through the use of the qui tam device

---

[5] The Court does note, however, that the FCA's qui tam provisions have generated renewed skepticism at the United States Supreme Court. *See Wis. Bell, Inc. v. United States ex rel. Heath*, 604 U.S. 140, 167 (2025) (Kavanaugh, J., and Thomas, J., concurring) ("The [FCA]'s *qui tam* provisions raise substantial constitutional questions under Article II."); *accord United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 449 (2023) (Thomas, J., dissenting).

under the FCA," all of which runs directly counter to Defendants' arguments. *United States ex rel. Butler v. Shakira*, 748 F. Supp. 3d 1277, 1295 (S.D. Fla. 2024).

## B.    Rule 12(g)(2)

Plaintiffs move to strike Defendants' renewed motion to dismiss, arguing that it raises several arguments that were not made in Defendants' first motion to dismiss and therefore violates Federal Rule of Civil Procedure 12(g)(2). (Doc. 86 at 1).  They raise the same argument in response to Defendants' motion. (Doc. 87 at 1–3).

Rule 12(g)(2) states that, "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." But Rule 12(h)(2)(B) permits a party to raise a failure to state a claim argument in a motion for judgment on the pleadings.  Because Defendants could have raised any of their novel arguments in such a motion, the Court can consider all of their arguments, Rule 12(g)(2) notwithstanding. *See Fernau v. Enchante Beauty Prods., Inc.*, 847 F. App'x 612, 620 (11th Cir. 2021) ("[A] 'district court's decision to consider a successive Rule 12(b)(6) motion to dismiss is usually harmless, even if it technically violates Rule 12(g)(2).'" (quoting *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 321 (3d Cir. 2015))); *Chevaldina v. Ctr. for Individual Rights*, 2024 WL 49695, at *1 & n.3 (11th Cir. Jan. 4, 2024) (affirming the dismissal of a complaint "for failure to state a claim" and dismissing the plaintiff's Rule

12(g)(2) argument because "[t]he substance of the Rule 12(b)(6) motion . . . could have been made under Rule 12(c)").[6]

## C.    Shotgun Pleading

Defendants assert that the operative complaint is a shotgun pleading because it "includes ten counts against all eight Defendants without specifying which Defendants are responsible for which acts." (Doc. 84 at 29).  A complaint asserting several claims against multiple defendants without differentiating between them may constitute a shotgun pleading. *See Weiland*, 792 F.3d at 1323 (describing as shotgun pleadings complaints that commit "the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against").  But a plaintiff may properly assert claims against a group of related defendants collectively. *See Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000) ("The fact that defendants are accused collectively does not render the complaint deficient.  The complaint can be fairly read to aver that all defendants are responsible for the alleged conduct."); *Sprint Sols., Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1227 (S.D. Fla. 2014) ("[A] plaintiff may plead claims against multiple defendants

---

[6] Other courts in this circuit have disregarded Rule 12(g)(2) arguments where, as here, the defendant's prior motion to dismiss was not ruled on because the plaintiff filed an amended complaint, mooting the motion to dismiss. *Roop v. Prime Rate Premium Fin. Corp.*, 710 F. Supp. 3d 1165, 1171 n.3 (M.D. Fla. 2024) ("Prime Rate did not waive (under Federal Rule of Civil Procedure 12(g)(2)) the arguments brought in the instant [m]otion to [d]ismiss by not bringing them in its previous motion to dismiss.  The Court never ruled on Prime Rate's previous motion, which addressed a previous version of [the p]laintiffs' [a]mended [c]omplaint." (internal citations omitted)); *see also Burgess v. Vfinity, LLC*, 2017 WL 2311753, at *6 n.6 (M.D. Fla. May 26, 2017) ("Plaintiffs also argue in their [r]esponse that the motions to dismiss should be denied because Federal Rule of Civil Procedure 12(g)(2) prohibits the filing of successive Rule 12 motions to dismiss. This argument fails as the previous motions to dismiss were denied as moot because an amended complaint was filed. . . .  Rule 12(g) does not apply." (internal citations omitted)).

by referring to them collectively, for example[,] by referring to a group of defendants as 'defendants.'" (citing *Crowe v. Coleman*, 113 F.3d 1536, 1539 (11th Cir. 1997))).  Because Defendants are eight related corporate entities, each of which Plaintiffs allege were involved in a fraudulent conspiracy, the allegations involving Defendants collectively do not render the complaint a shotgun pleading. *See Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 407 F. Supp. 3d 1216, 1236 (N.D. Ala. 2019) ("With 44 separate defendants, the court cannot possibly expect Roche to individually list each defendant every time it refers to the defendants in the complaint.  Such an expectation would create an unwieldy and cumbersome complaint.").

However, the way in which Plaintiffs attempt to define Defendants is problematic. Plaintiffs define Defendant Comfort Care Hospice, L.L.C. as "Defendant Comfort Care." (*Id.* at 3, para. 7).  But they then choose to use that same term as a shorthand for all Defendants. (*Id.* at 6, para. 15 ("Accordingly, throughout this Complaint, Comfort Care and the many hospice agencies operated by Comfort Care will be collectively referred to as 'Defendants' or 'Defendant Comfort Care.'")).  This despite the fact that Plaintiffs had already defined Defendants collectively as "Comfort Care." (*Id.* at 1–2).  Accordingly, Plaintiffs' later references to "Defendant Comfort Care" are rendered ambiguous, as the Court cannot tell without speculating whether these allegations refer to Comfort Care Hospice, L.L.C., standing alone, or to all Defendants. (*See id.* at 24–25, para. 70(c); *id.* at 26–27, para. 70(h); *id.* at 29, para. 71(c)).  Plaintiffs' manner of defining the parties introduces sufficient ambiguity such that amendment is appropriate.

Plaintiffs urge the Court not to dismiss their claims with prejudice but rather to grant leave to amend if the Court determines that the operative complaint is "still ambiguous." (Doc. 87 at 11–12).  Dismissal with prejudice "on the basis of . . . mere technicalities" is only proper in limited circumstances, including where there has been "repeated failure to cure deficiencies by amendments previously allowed." *Foman v. Davis*, 371 U.S. 178, 181–82 (1962).  Plaintiffs have only amended their complaint once, and they did so voluntarily.  Thus, they have not failed to cure deficiencies by *amendments* (plural) previously allowed.  This case is distinguishable from that cited by Defendants, *Jackson v. Bank of America, N.A.*, because there the court dismissed the plaintiffs' amended complaint with prejudice only after it had granted the defendants' prior motion for a more definite statement. 898 F.3d 1348, 1358 (11th Cir. 2018).  Moreover, the Court finds that Plaintiffs responded in good faith to the deficiencies highlighted in Defendants' motion to dismiss the original complaint—the operative complaint does not contain multiple counts adopting all the allegations that precede it or lump multiple causes of action into the same count, like the original complaint did. (*See* doc. 1 at 40–47, paras. 74–114); *see Jackson*, 898 F.3d at 1358–59 ("Here, after being put on notice by Defendants of the specific defects in their complaint, the Jacksons filed an amended complaint afflicted with the same defects, attempting halfheartedly to cure only one of the pleading's many ailments by naming which counts pertained to each Defendant.").

For these reasons, dismissal with prejudice on shotgun pleading grounds is unwarranted.  However, because all of Plaintiffs' claims are due to be dismissed without

prejudice on other grounds, Plaintiffs shall take care to address the deficiencies identified in this Order if they choose to amend.[7]

### D.    First-to-File Bar

Defendants argue that the "majority" of Plaintiffs' claims are due to be dismissed under the first-to-file bar. (Doc. 84 at 13).  The Court turns to that argument after resolving three prefatory questions:  Whether the first-to-file bar (1) is jurisdictional, (2) applies to discrete claims, and (3) requires a comparison of the original or amended complaints.

### 1.    Jurisdictional

There is a split among the circuit courts of appeals as to whether the first-to-file bar is jurisdictional—though it's an increasingly lopsided split in favor of finding the bar nonjurisdictional. *See United States v. Millenium Lab'ys, Inc.*, 923 F.3d 240, 251 (1st Cir. 2019) (nonjurisdictional); *United States ex rel. Hayes v. Allstate Ins. Co.*, 853 F.3d 80, 86 (2d Cir. 2017) (same); *In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 974 F.3d 228, 233 (3d Cir. 2020) (same); *United States ex rel. Bryant v. Cmty. Health Sys., Inc.*, 24 F.4th 1024, 1036 (6th Cir. 2022) (same); *Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244, 1247 (9th Cir. 2024) (same); *Heath*, 791 F.3d at 121 (same); *but see United States ex rel. Rosales v. Amedisys N.C., L.L.C.*, 128 F.4th 548, 561 (4th Cir. 2025)

---

[7] Defendants also argue that the operative complaint is a shotgun pleading because it "contains a swath of irrelevant assertions seemingly unrelated to any specific cause of action." (Doc. 84 at 30–31).  The Court does not find that the operative complaint suffers from this defect. *See Cramer v. Florida*, 117 F.3d 1258, 1261 (11th Cir. 1997) (discerning a shotgun pleading where the complaint was "so disorganized and ambiguous that it [wa]s almost impossible to discern precisely what . . . the[] appellants [we]re claiming").

(jurisdictional);[8] *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 376–77 (5th Cir. 2009) (same); *United States ex rel. Little v. Triumph Gear Sys., Inc.*, 870 F.3d 1242, 1246 (10th Cir. 2017) (same).

The majority position is supported by the first-to-file bar's text, which does not clearly state that the bar is jurisdictional. *See* 28 U.S.C. § 3730(b)(5) ("When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."); *see also Santos-Zacaria v. Garland*, 598 U.S. 411, 416 (2023) ("We treat a rule as jurisdictional only if Congress clearly states that it is." (quotation omitted)). This is especially poignant as the FCA elsewhere clearly creates jurisdictional bars. *See* 28 U.S.C. § 3730(e); *Kucana v. Holder*, 558 U.S. 233, 249 (2010) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration adopted) (quotation omitted)). Without guidance from the Eleventh Circuit, the Court sides with the majority—the first-to-file bar is not jurisdictional.

Nevertheless, a claim barred by the first-to-file rule should still be dismissed without prejudice because § 3730(b)(5) only operates to bar actions related to "pending" actions. So "an earlier suit bars a later suit while the earlier suit remains undecided but ceases to bar that suit once it is dismissed." *Kellogg Brown & Root Servs., Inc. v. United States ex*

---

[8] Though the Fourth Circuit found the first-to-file bar jurisdictional because the panel was bound by prior precedent it noted that the Fourth Circuit is part of "a rapidly shrinking minority of circuits taking that view." *United States ex rel. Rosales v. Amedisys N.C., L.L.C.*, 128 F.4th 548, 561 (4th Cir. 2025).

*rel. Carter*, 575 U.S. 650, 662 (2015).  Of course, some other impediment—res judicata or the statute of limitations, for example—may independently operate to bar the later suit, but the first-to-file bar has no effect on actions filed *after* the earlier-filed claim is no longer pending.

### 2.    Discrete Claims

A threshold issue lies implicit in Defendants' briefing.  Looking to the text of the first-to-file bar, it would appear that it operates to bar *actions* from being brought while an earlier-filed and related *action* remains pending.  And an "action" generally refers to an entire lawsuit, rather than to discrete claims comprising that lawsuit. *See Action*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A civil or criminal judicial proceeding; esp., lawsuit.").  That's how the Eleventh Circuit defines the term in the context of a voluntary dismissal under Federal Rule of Civil Procedure 41, which governs the dismissal of "actions." *Perry v. Schumacher Grp. of La.*, 891 F.3d 954, 958 (11th Cir. 2018) ("It is clear from the text [of Rule 41(a)(1)(A)] that only an '*action*' may be dismissed.  There is no mention in the Rule of the option to stipulate dismissal of a portion of a plaintiff's lawsuit— *e.g.*, a particular *claim*—while leaving a different part of the lawsuit pending before the trial court." (emphases in original)).  But Defendants appear to silently assume that the first-to-file bar can be applied to individual claims, rather than to the entire action. (*See* doc. 84 at 13 ("The *majority* of Relators' Amended Complaint must be dismissed under the first-to-file bar because its claims overlap with another, earlier-filed *qui tam* suit against Comfort Care." (first emphasis added))).  Plaintiffs, on the other hand, seem to think that all of their claims rise or fall together. (*See* doc. 87 at 30 ("The differences [between

19

Brooks' and Plaintiffs' complaints] are certainly significant and numerous enough to defeat dismissal of the subsequently filed Bryant-Blackwood Complaint.")).

Defendants' interpretation—the intuitive interpretation—is the right one.  Circuit courts of appeals have long noted that "the draftsmanship of the qui tam statute has its quirks." *United States ex rel. Merena v. Smithkline Beecham Corp.*, 205 F.3d 97, 101 (3d Cir. 2000) (Alito, J.).  One of these quirks is "that the statute is based on the model of a single-claim complaint even though many qui tam actions involve multiple claims." *United States ex rel. Lovell v. AthenaHealth, Inc.*, 56 F.4th 152, 159 (1st Cir. 2022) (quotation omitted); *see United States ex rel. Conyers*, 108 F.4th 351, 357 n.7 (5th Cir. 2024) ("[T]he FCA frequently uses the terms 'action' and 'claim' interchangeably, since the statute is based on the model of a single-claim complaint." (quotation omitted)).  Because strict compliance with the text of the FCA would produce absurd results, courts have historically overlooked some of these "quirks"—especially as it relates to the apparent conflation of "actions" and "claims." *See Merena*, 205 F.3d at 102 ("The statute authorizes a qui tam plaintiff to bring a civil action for a *violation* of [§] 3729, but surely such a plaintiff may bring an action containing multiple claims, each of which alleges a separate violation of [§] 3729." (quotation omitted and emphasis in original)).

The long and the short of this diversion is that, although the first-to-file bar speaks of "actions," "when it is asserted that a later-filed complaint contains claims that are based on the facts underlying certain claims in a pending multi-count complaint, the court must conduct a claim-by-claim analysis in order to determine if [§] 3730(b)(5) applies." *Id.*

Accordingly, much of Plaintiffs' response to Defendants' motion is unpersuasive; because Plaintiffs appeared to believe that the first-to-file bar operated globally, many of their arguments are made at too high a level of generality to be convincing. For example, Plaintiffs attempt to distinguish their *complaint* from Brooks' *complaint*. (Doc. 87 at 30–33). Relatedly, Plaintiffs do not make much of an effort to distinguish their complaint from Brooks' with regard to the plan of care allegations—they reference Brooks' allegations regarding plans of care (doc. 87 at 18, 20, 22, 31 n.7), but their attempt to distinguish the complaints is at such a high level that details like the plan of care allegations are essentially omitted (*see id.* at 30–33). This high level of generality renders Plaintiffs' submission unavailing throughout.[9]

### 3.    Complaint

Plaintiffs in the instant action have amended their complaint once (doc. 82), as has Brooks, (*see* doc. 51 in *Brooks*). The parties suggest that the Court should compare Plaintiffs' operative complaint with Brooks' original complaint, the idea apparently being that the question is whether Plaintiffs' live claims are barred by Brooks' original allegations. (*See* doc. 84 at 13–17; doc. 87 at 12–33). That's more or less how the first-to-file bar analysis proceeds in other circuits. *See, e.g.*, *Rosales*, 128 F.4th at 557 ("[A] district

---

[9] Similarly unavailing is Plaintiffs' argument that their complaint is not related to Brooks' because Brooks, unlike Plaintiffs, alleges violations of the Anti-Kickback statute. (*See* doc. 87 at 32); *Cho ex rel. States v. Surgery Partners, Inc.*, 30 F.4th 1035, 1044 (11th Cir. 2022) (dispensing with the plaintiffs' "argument that their FCA conspiracy claim" was "unrelated" to a pending action that "alleged only substantive FCA violations . . . in short order," and determining that the conspiracy claim was barred because it was "based on the same fraudulent scheme that was alleged in the" pending action, so "the government would have been equipped to investigate both substantive FCA violations and any conspiracies stemming from, or derivative to, the same scheme").

court applying the [FCA]'s first-to-file rule should analyze all properly filed complaints claim-by-claim to determine which relator was the first to bring a specific claim, or to bring that claim against a particular defendant."). But the Eleventh Circuit has determined that the first-to-file bar requires a comparison of the original complaints. *See Cho*, 30 F.4th at 1042–43 & n.4. Accordingly, the Court compares the allegations in Brooks' original complaint with Plaintiffs' original complaint—though the Court notes that the distinction between Plaintiffs' original and operative complaints is a technical one, as the factual allegations are essentially identical.

### 4.    Application of the First-to-File Bar

Plaintiffs do not dispute that *Brooks* was pending when they brought this action— nor could they, as their original complaint was filed several months after the *Brooks* complaint. (*Compare* doc. 1, *with* doc. 1 in *Brooks*). Thus, the Court limits its analysis to the relatedness inquiry. Defendants argue that three of the fraudulent schemes Plaintiffs identify are related to, and thus barred by, the claims asserted by Brooks: Defendants' (1) admission, certification, and recertification of ineligible hospice patients (Counts Four, Five, and Six); (2) failure to properly execute and follow plans of care (Counts One, Two, and Three); and (3) fraudulent marketing practices (Count 7). The Court examines each scheme in turn.

### a.    Ineligible Hospice Patients

In Brooks' original complaint, she alleges that Comfort Care Hospice, L.L.C. "defrauded the United States by submitting, or causing to be submitted, false or fraudulent claims to Medicare for hospice patients who were not terminally ill and were thus ineligible

22

for the Medicare Hospice Benefit." (Doc. 1 at 17, para. 38 in *Brooks*).  Indeed, this scheme is central to her complaint, which includes allegations related to, and expanding upon, the scheme. (*See, e.g.*, doc. 1 at 18, para. 41 in *Brooks* ("Defendant Comfort Care [Hospice, L.L.C.] knowingly and deliberately admits non-terminal, ineligible[] patients to its hospice rolls.  To that end, Comfort Care—primarily through Chief Operating Officer Lisa Teel— set aggressive census goals and implemented procedures designed to ensure those goals were met.  These aggressive census goals and procedures are enforced *on all Comfort Care agencies and therefore cause the submission of false claims throughout Comfort Care's agencies*." (emphasis added)); *id.* at 19, para. 43 in *Brooks* ("[M]any people that are referred to Comfort Care Hospice [L.L.C.] . . . are not actually terminally ill; nevertheless, Comfort Care admits those patients to its end-of-life hospice care rolls. . . . [T]hese patients are continually recertified for hospice care despite clear medical evidence that these patients are not declining and are therefore non-terminal and ineligible for the Medicare Hospice Benefit.")).  Brooks also identified specific individuals who were improperly certified and recertified for hospice benefits spanning a four-year period from 2016 through July 2020, when her complaint was filed. (Doc. 1 at 20–21, para. 47 in *Brooks*).  Dr. Wagner is a central figure in these allegations, permitting others to apply his signature to the required paperwork without "exercis[ing] clinical judgment in certifying patient[s'] terminal prognos[e]s." (Doc. 1 at 22, para. 50 in *Brooks*).

Likewise, Plaintiffs allege in their original complaint that Defendants have been "systematically enrolling ineligible patients in hospice care and fraudulently submitting claims for payments to Medicare and Medicaid for providing this heightened level of health

care." (Doc. 1 at 8, para. 17).  They further allege that Defendants "are currently defrauding the United States, including the States of Alabama and Tennessee, . . . by . . . systematically targeting and enrolling non-qualified persons as patients under the hospice benefit guidelines as prescribed by Medicare and Medicaid," as well as "regularly re[]certifying patients who[] are not terminal but instead chronic or are still receiving curative care from providers that were unaware that the patient was enrolled in a hospice program." (*Id.* at 21, para. 59; *see also id.* at 25, paras. 68–69).  As part of this scheme, Plaintiffs allege that Defendants specifically targeted Alzheimer's patients, all of whom were "believed to be inappropriate for hospice care, but [who] were admitted and billed by the Defendants for extended periods of time." (*Id.* at 36, para. 71; *see also* doc. 82 at 28 ("The Relators have witnessed the fraudulent activities and schemes of the Defendants regarding enrollment, re-enrollment, and lack of discharge of ineligible patients.")).

Plaintiffs argue that the fraudulent scheme Brooks identified is "very narrow and distinct," claiming that Brooks' allegations are "based around the Cullman Agency and Dr. Wagner." (Doc. 87 at 19).  They therefore attempt to magnify Dr. Wagner's and Lisa Teel's involvement. (*See id.* at 19–24).  But that overlooks the fact that Brooks' original complaint expressly alleges that the conduct was occurring at "all Comfort Care agencies," resulting in the "submission of false claims throughout Comfort Care's agencies." (Doc. 1 at 18, para. 41 in *Brooks*).

The relatedness of the complaints, at least in this regard, is apparent.  Both allege that a specific entity (Comfort Care Hospice, L.L.C.) was committing a specific type of

fraud (knowingly certifying and recertifying ineligible patients for hospice care) in a specific state (Alabama).  Indeed, even the relevant time periods are similar. (*Compare* doc. 1 at 26–38, paras. 70–71 (allegations ranging from 2015 through 2019), *with* doc. 1 at 20–21, 25, 27, paras. 47, 56, 59 in *Brooks* (describing allegations between 2016 and 2020)). The minor distinctions Plaintiffs try to draw between their lawsuit and Brooks' cannot untether the two.  *See Cho*, 30 F.4th at 1044 ("Taken as a whole, both complaints allege the same essential . . . scheme . . . .  Based on the [pending action], the government was already alerted to that scheme, and would have been equipped to investigate whether any corporate affiliates or investors connected to Surgery Partners and Logan Labs were participants."); *United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 169 (2d Cir. 2018) ("Though Wood's allegations may be more detailed than those asserted in [the pending action], the two cases in essence alleged very similar kickback schemes."); *United States ex rel. Robertson v. Millenium Physician Grp.*, 2023 WL 2022228, at *5 (M.D. Fla. Feb. 15, 2023) ("[W]hile . . . there are differences between the two complaints, there are myriad, essential facts in common [such] that these complaints must be deemed 'related' for the FCA's first-to-file rule.").  Accordingly, Counts Four, Five, and Six are barred by the first-to-file bar.

### b.    Plans of Care

In Brooks' original complaint, she alleged that Comfort Care Hospice, L.L.C., "failed to provide legitimate hospice services pursuant to legitimate individualized [p]lans of [c]are developed by and supervised by a physician-led Interdisciplinary Group as required by Medicare." (Doc. 1 at 17, para. 39 in *Brooks*).  These allegations were related

both to her claims that the defendants were improperly enrolling ineligible patients into hospice care, (*see* doc. 1 at 26, para. 57 in *Brooks*; doc. 1 at 30–31, para. 69 in *Brooks*), and that the defendants' lack of proper plans of care deprived their patients of adequate care, (*see* doc. 1 at 24, para. 54 in *Brooks* ("Comfort Care [Hospice, L.L.C.] resoundingly failed to provide physician oversight and supervision . . . , including not providing legitimate plans of care, which endangered patients and resulted in false claims for payment because legitimate hospice services were not provided."); doc. 1 at 37, para. 81(c) in *Brooks* ("Defendant Comfort Care [Hospice, L.L.C.] and Defendant Wagner created and used fraudulently devised plans of care, thereby depriving patients of valid hospice care[] . . . .")).

Turning to Plaintiffs' original complaint, they allege that "Defendants did not provide a written plan of care for each individual admitted to a hospice program." (Doc. 1 at 24, para. 64 (quotation omitted)).  And even to the extent that some of their patients do receive individual plans of care, Plaintiffs allege that "Defendants systematically fail to follow" them. (*Id.* at 24, para. 65).  These allegations are related both to Plaintiffs' claims that Defendants improperly enroll patients into hospice care without the required plans of care, (*see id.* at 24, para. 66), as well as their claims that Defendants fail to provide care more broadly, (*see id.* at 43, para. 93; *id.* at 44, para. 95; *see also* doc. 82 at 21–22, paras. 65–66; *id.* at 37, paras. 76, 79).  After carefully comparing the complaints side-by-side, the Court has little difficulty discerning that these allegations are related, too.

However, which claims are barred as a result of that relation is a different question. The plan of care allegations form part of the basis for Plaintiffs' claims under Counts Four,

Five, and Six—the improper enrollment of ineligible patients into hospice care, which are barred. However, the plan of care allegations are also used to support Plaintiffs' claims of non-rendered medical care under Counts One, Two, and Three. (*See* doc. 82 at 37, para. 76 ("Defendants falsely claimed that patients are treated according to their plans of care . . . . By submitting claims based on non-rendered care, . . . Defendants submitted false and fraudulent claims for payment to the Government.")). Nevertheless, there may be some daylight between Plaintiffs' and Brooks' claims as it relates to non-rendered or inadequate medical care. Brooks' allegations in that vein appear to be limited to her plan of care allegations, whereas Plaintiffs seem to allege more broadly that the care rendered to hospice patients was inadequate. (*See* doc. 1 at 26, para. 70 ("The Relators have witnessed the fraudulent activities and schemes of the Defendants as Defendants urged all employees to grow the income stream of Defendants by admitting as many patients as possible and by not providing required services."); *id.* at 28–29, para. 70(f)–(i); *accord* doc. 82 at 23, para. 70 ("The Relators have witnessed the fraudulent activities and schemes of the Defendants regarding the billing of government programs[] . . . for inadequate or non-performed medical care."); *id.* at 37, para. 79 (claiming that Defendants made "false statements" that were "material to the presentment of . . . false claims," "including that proper medical care was rendered, patients' plans of care were followed, chaplain services were provided, and volunteer hours were provided")). Insofar as these allegations go to a fraudulent scheme that is "broader, more pervasive, or distinct," any claims they could support may not be barred by the first-to-file rule. *Cho*, 30 F.4th at 1043.

To be sure, the distinction between the related plan of care allegations and Counts One, Two, and Three, if any, is minimal. However, as mentioned, the parties' briefing on this issue is not entirely on point—both parties look to Plaintiffs' operative complaint rather than their original complaint, and Plaintiffs attempt to distinguish their complaint as a whole from Brooks' rather than go claim-by-claim. Because of this, and because Plaintiffs' complaint suffers from other deficiencies, the Court does not find that Counts One, Two, and Three are barred at this time.

### c.    Fraudulent Marketing Practices

In her complaint, Brooks included a reference to the "aggressive methods" Comfort Care Hospice, L.L.C. used to source patient referrals, noting that employees were "encouraged to solicit referrals not only from healthcare facilities . . . but also 'from the community' such as from employees' churches." (Doc. 1 at 18–19, para. 42–43 in *Brooks*). These allegations were part of her broader claim that Comfort Care Hospice, L.L.C. was enrolling ineligible patients into the Medicare hospice benefit. (*See* doc. 1 at 19, para. 43 in *Brooks* ("Due to the motivation of these incentives, and to the lack of legitimate medical oversight . . . , many people that are referred to Comfort Care . . . through these aggressive methods are not actually terminally ill[] . . . .")). Likewise, Plaintiffs here allege that Defendants "aggressively market hospice services to non-terminal patients and admit and discharge patients based solely upon profitability, rather than upon medical necessity." (Doc. 1 at 36, para. 71). This similarly feeds into their claim that Defendants' marketing practices are intended to, or at least have the desired effect of, enrolling ineligible patients. (*See id.* at 39, para. 72 ("[A]lmost all of Defendant Comfort Care's patients are referred by

28

sources other than treating physicians—primarily through direct-to-patient marketing—and . . . treating physicians rarely play more than a passive role in hospice admission . . . .")).  It also supports Plaintiffs' standalone FCA claim in Count Seven for "fraudulent marketing practices," in which Plaintiffs allege that Defendants used "aggressive marketing practices," which included "false or fraudulent statements," to induce ineligible patients into hospice care. (Doc. 82 at 40, paras. 94–95).  Because Count Seven "rel[ies] on the same essential facts" and involves "a fraudulent scheme the government already would be equipped to investigate based on the [*Brooks*] complaint," it is barred. *Cho*, 30 F.4th at 1042 (quotations omitted).

Plaintiffs' attempts to avoid this conclusion are unsuccessful.  They argue that they "donate a sizable portion of their complaint towards alleging the tasteless marketing procedures and practices of Comfort Care," whereas Brooks made "a single passing reference to marketing." (Doc. 87 at 32).  Even if it's true that Plaintiffs make more of Comfort Care's allegedly fraudulent marketing than Brooks did, that does not change the fact that the government would have been equipped to investigate the marketing based on Brooks' complaint, as Plaintiffs do not include allegations that the marketing scheme they identify is broader, distinct, or more pervasive than that alleged by Brooks.  Similarly, that Plaintiffs (in the operative complaint) attempt to narrow these allegations to focus on Alzheimer's patients specifically misses the point, as the caselaw holds that narrow allegations are generally subsumed by—and thus related to—broad allegations. *See Cho*, 30 F.4th at 1043 (noting with approval that other circuits had found broad allegations to bar subsequently filed narrow allegations, and vice versa).  And Plaintiffs' argument that

Brooks' marketing allegations "do[] not concern direct to patient marketing" (doc. 87 at 32) is simply inaccurate, (*see* doc. 1 at 18–19, para. 42 in *Brooks* ("Employees[] . . . are encouraged to solicit referrals . . . 'from the community' such as from employees' churches.")).  The fact that these allegations are the basis for a discrete claim in Plaintiffs' operative complaint is of no moment. *See supra* n.12.

For these reasons, the Court determines that Plaintiffs' fraudulent marketing allegations are related to Brooks'.  Count Seven is therefore barred.

**E.    Failure to State a Claim**

Defendants assert that all of Plaintiffs' claims—for one reason or another—fail to state a claim.  Because Counts Four, Five, Six, and Seven are barred, the Court does not consider Defendants' arguments that they also fail to state a claim.  However, the Court finds that Counts One, Two, Three, Eight, Nine, and Ten fail to state a claim and are therefore due to be dismissed.

**1.    Counts One and Two**

Defendants argue that Plaintiffs fail to plausibly allege the submission of a false claim (doc. 84 at 17–21), which is "the *sine qua non* of a[n FCA] violation," *Clausen*, 290 F.3d at 1311.  A plaintiff bringing a claim under §§ 3729(a)(1)(A) or (B)—as Plaintiffs do in Counts One and Two—must "plead with particularity that an actual claim has been submitted." *Olhausen*, 124 F.4th at 859.  This requires them to provide in the complaint "some indicia of reliability . . . to support the allegation of *an actual false claim* for payment being made to the government." *Clausen*, 290 F.3d at 1311 (emphasis in original).

30

> [T]he particularity standard in qui tam actions requires the relator to allege the *actual submission* of a false claim. We have said this over and over. It is not enough to plead generally that false claims were submitted, nor may a relator merely point to improper practices of the defendant to support the inference that fraudulent claims were submitted because submission cannot be inferred from the circumstances. Rather, the relator must allege the who, what, where, when, and how of fraudulent submissions.

*Olhausen*, 124 F.4th at 860–61 (quotation modified). To satisfy this standard, the plaintiff may submit "billing data or a representative sample claim proving that allegedly false claims were actually submitted." *Id.* at 861. Or, if they are an insider, they may include allegations sufficient to show that they enjoyed "direct, first-hand knowledge" that false claims were submitted. *Id.* at 866; *accord United States ex rel. Walker v. R & F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (holding that Rule 9(b) was satisfied where the relator, a nurse employed by the defendant, had conversations about the defendant's billing practices with the defendant's office manager).[10]

Plaintiffs' conclusory allegations as to billing are manifestly insufficient. (*See, e.g.*, doc. 82 at 19, para. 59 ("Defendants routinely admitted and billed Medicare for hospice patients who plainly and objectively did not meet Medicare criteria . . . , and Defendants falsely billed the United States for these services."); *id.* at para. 60 ("Upon information, personal knowledge, and experience shown through testimony, affidavits, census reports, billing detail reports, and other internal documents of the Defendants, it is known and

---

[10] This list is not exhaustive. *See Olhausen v. Arriva Med., LLC*, 124 F.4th 851, 861 (11th Cir. 2024) ("[T]here is no single formula that complaints must follow. . . . The bottom line is that a relator must provide some indicia of reliability to support the allegation of an *actual false claim* for payment being made to the Government." (emphasis in original, alteration adopted, and internal citation and quotation omitted)).

illustrated that the Defendants have and are currently defrauding the United States . . . .")). *See Clausen*, 290 F.3d at 1313 (deeming insufficient "the conclusory allegation that [the defendant] submitted bills to the Government 'on the date of service or within a few days thereafter,'" reasoning that if "Rule 9(b) is to carry any water, it must mean that an essential allegation and circumstance of fraudulent conduct cannot be alleged in such conclusory fashion"). To be sure, Plaintiffs include detailed allegations regarding the patients Plaintiffs allege were the subject of fraudulent claims. (*See, e.g.*, doc. 82 at 23, para. 70(a) (describing "Patient C.K.M.," who was allegedly "assigned a nurse that never visited," despite "records . . . reflect[ing] that the nurse visited the patient as required and as Defendants billed Medicare")). As descriptive as these allegations are, no amount of detail can transform them into allegations regarding claims that were *actually submitted* to the government. *See Clausen*, 290 F.3d at 1312 ("In none of [the plaintiff's] descriptions of alleged schemes by [the defendant] to increase its testing and testing revenues—which are accompanied by dozens of pages of exhibits—does [the plaintiff] provide any factual basis for his conclusory statement tacked on to each allegation that bills were submitted to the Government as a result of these schemes[] . . . .").

Nor are Plaintiffs, based on the allegations in the operative complaint, the sort of insiders courts generally ascribe credibility to regarding the submission of a false claim. True, Plaintiffs are nurses who worked for Defendants for several years, and at this stage the Court accepts as true that they have first-hand knowledge of the fraudulent schemes they allege. (*See* doc. 82 at 20, para. 61). But Plaintiffs do not allege that they were in a

position to know that false claims really were submitted to the government, and thus, the

operative complaint falls short.  Consider the following from the Eleventh Circuit:

> In the case at hand, the complaint fails [R]ule 9(b) for want of sufficient indicia of reliability to support the assertion that the defendants submitted false claims. . . . [The plaintiff] has described in detail what he believes is an elaborate scheme for defrauding the government by submitting false claims.  He cites particular patients, dates[,] and corresponding medical records for services that he contends were not eligible for government reimbursement. . . . [But the plaintiff] fails to provide the next link in the FCA liability chain:  showing that the defendants *actually submitted* reimbursement claims for the services he describes.  Instead, he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement.

*United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358–59 (11th Cir. 2006)

(emphasis in original); *see United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591

F. App'x 693, 704 (11th Cir. 2014) ("[A] plaintiff-relator without first-hand knowledge of

the defendants' billing practices is unlikely to have a sufficient basis for such an

allegation.").  Plaintiffs' roles as nurses—absent more—do not suffice. *Compare Atkins*,

470 F.3d at 1359 ("[The plaintiff] does not profess to have firsthand knowledge of the

defendants' submission of false claims.  He is a psychiatrist responsible for the provision

of medical care, not a billing and coding administrator responsible for filing and submitting

the defendants' claims for reimbursement."), *with Mastej*, 591 F. App'x at 708 (concluding

that the "complaint contain[ed] sufficient indicia of reliability" because the plaintiff "had

direct information about . . . billings, revenues, and payor mix, and . . . was in the very

meetings where Medicare patients and the submission of claims to Medicare were

discussed").

In short, over the course of more than a dozen pages, Plaintiffs exhaustively detail the fraudulent scheme they allege Defendants have perpetrated. (*See* doc. 82 at 19–36, paras. 60–73). But it is insufficient to meticulously outline violations of federal regulations without also alleging the submission of false claims. *Atkins*, 470 F.3d at 1359 ("[The plaintiff] fails to . . . show[] that the defendants *actually submitted* reimbursement claims for the services he describes. Instead, he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement." (emphasis in original)). Accordingly, Counts One and Two fail to state a claim, and are therefore due to be dismissed.

## 2.    Count Three

Count Three asserts that, in violation of § 3729(a)(1)(G), Defendants, after being reimbursed by the government for the false claims alleged in Counts One and Two, "knowingly and improperly avoided their legal obligation to reimburse the government for these overcharges." (*See* doc. 82 at 38, paras. 81–82). But § 3729(a)(1)(G) cannot be used merely as another avenue to seek relief already available under §§ 3729(a)(1)(A) or (B). *See United States ex rel. Wallace v. Exactech, Inc.*, 2022 WL 2919349, at *12 (N.D. Ala. July 25, 2022) ("Several courts, including those in the Eleventh Circuit, have found that in order for the concealment of an obligation to be actionable under the reverse false claim provision [(§ 3729(a)(1)(G))], the obligation must arise independent of the affirmative false claims that are actionable under the other FCA provisions."); *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 97 (D.D.C. 2014) (Jackson, J.) ("[B]y this logic, just about *any* traditional false statement or presentment action would give rise to a reverse

false claim action; after all, presumably any false statement actionable under [§§] 3729(a)(1)(A) or 3729(a)(1)(B) could theoretically trigger an obligation to repay the fraudulently obtained money." (emphasis in original)).  Plaintiffs concede as much by failing to present argument in opposition to Defendants' motion on this point. (*See* doc. 87).  Count Three is accordingly dismissed.

### 3.      Counts Eight, Nine, and Ten

Counts Eight through Ten—Plaintiffs' TMFCA claims—are woefully deficient. Plaintiffs allege that because Defendants have submitted false claims related to their operations in Alabama, they must be doing the same in Tennessee, where they also operate.

> [Plaintiffs] have personal knowledge that Defendants commit the alleged fraud and follow the same fraudulent schemes as set out herein within the State of Alabama and throughout Alabama as it is Defendants' corporate mentality, and Defendants' have now expanded operations into Tennessee, *and it is believed the same conduct is ongoing* as it is corporate mentality [sic].

(Doc. 82 at 2, para. 2 (emphasis added)).  But the operative complaint does not assert that Plaintiffs have *knowledge* that Defendants are submitting false claims in violation of the TMFCA—this is only an assumption.  Perhaps because of this deficiency, Plaintiffs do not incorporate *any* factual allegations into Counts Eight, Nine, or Ten. (*See id.* at 41–43, paras. 97–111).  Counts Eight through Ten therefore fall well short of stating a claim and are also subject to dismissal. *See Clausen*, 290 F.3d at 1310 (explaining that FCA claims are subject to Rule 9(b) and must therefore be supported by "facts as to time, place, and substance of the defendant's alleged fraud," including "details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them" (quotation omitted)); *United States*

*ex rel. Alt v. Anesthesia Servs. Assocs., PLLC*, 2019 WL 7372510, at \*11 (M.D. Tenn. Dec. 31, 2019) ("The elements of a claim under the TMFCA are virtually identical to those of an FCA claim. Accordingly, the analysis of the sufficiency of the pleading is equally applicable to both statutory claims." (internal citations and quotations omitted)); *see also United States ex rel. Carter v. Emergency Staffing Sols., Inc.*, 2023 WL 2754347, at \*7 (N.D. Tex. Mar. 31, 2023) (dismissing claims brought under state corollaries to the FCA because the plaintiff made "no non-conclusory allegations about any . . . state" other than Oklahoma," noting that he had "utterly failed to plead specific facts regarding" those state claims); *United States ex rel. Sonyika v. ApolloMD, Inc.*, 2021 WL 1222379, at \*12 & n.10 (N.D. Ga. Mar. 31, 2021) (same).

## V. CONCLUSION

For the reasons stated, and for good cause, it is

ORDERED as follows:

1.      Plaintiffs' motion to strike (doc. 86) is DENIED.

2.      Defendants' motion to dismiss (doc. 84) is GRANTED in part and DENIED in part.

        a.      Counts Four, Five, Six, and Seven are DISMISSED without prejudice without leave to refile under the first-to-file bar. Counts One, Two, Three, Eight, Nine, and Ten are DISMISSED without prejudice.

        b.      Defendants' motion to dismiss is otherwise DENIED.

3.      **On or before March 6, 2026,** Plaintiffs may file a second amended complaint that fully complies with this Order and the Court's Local Rules.

36

DONE this 19th day of February, 2026.

                                       _____/s/ Emily C. Marks_____
                                       EMILY C. MARKS
                                       UNITED STATES DISTRICT JUDGE